(No. 30471.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* OSCAR HOBBS *et al.*—(ALCOVER BROWN, Plaintiff in Error.)

*Opinion filed March 18, 1948—Rehearing denied May 17, 1948.*

EUCLID LOUIS TAYLOR, (WM. SCOTT STEWART, of counsel,) both of Chicago, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, of Springfield, and WILLIAM J. TUOHY, State's Attorney, of Chicago, (JOHN T. GALLAGHER, MELVIN S. REMBE, and W. S. MIROSLAWSKI, all of Chicago, of counsel,) for the People.

Mr. JUSTICE SIMPSON delivered the opinion of the court:

On February 21, 1947, plaintiff in error, Alcover Brown, having waived trial by jury, was found guilty

by the criminal court of Cook County of robbery while armed and was sentenced to the penitentiary for not less than two years nor more than five years. He was indicted for the offense jointly with Oscar Hobbs and Mark Dungee. Brown stood trial after his codefendants pleaded guilty. He has sued out a writ of error in this court to reverse the judgment against him.

After Hobbs and Dungee entered pleas of guilty, they moved to set those pleas aside. Their motions were denied but the court reserved sentence until after all the evidence was in. The same counsel who represented Brown also represented Hobbs and Dungee.

The People contend that Brown was proved to be an accessory before the fact, while he argues that the evidence fails to connect him in any way with the robbery. He admits that he drove Hobbs and Dungee to within one block of the Palmer House in Chicago where the robbery was committed but claims he had no knowledge whatever that a robbery was intended. It will be necessary to consider the facts in detail in arriving at our decision. Many of the facts are uncontradicted.

Brown was 27 years of age, married, and employed as post-office clerk. Early on the evening of the robbery Dungee was at the home of Brown when the latter arrived from work. While taking a bath Brown heard Dungee talking to someone on the phone. After eating the evening meal Brown drove Dungee to a friend's house on Thirty-third Street in Chicago where Dungee went upstairs while Brown sat in the car. In about fifteen minutes Dungee returned to the car and requested Brown to pick him up at his house at eleven o'clock to drive him downtown. Brown then went to his cousin's and stayed for a while and then went and picked Dungee up at about 11:30 P.M. and again took him to Thirty-third Street where the horn was blown and Oscar Hobbs came down and got in the car. Hobbs directed Brown to drive to the Palmer House

where he had worked saying that he was going to get some money. Near the Palmer House Hobbs and Dungee left the car, telling Brown to drive around the block and then pick them up. On the first trip around they had not come out of the hotel and Brown circled the block again. On the second round he met them and they got into the car and one said, "Go on, man. Pull out of here." Brown waited for a red street light to change and then went straight to Michigan Avenue. After getting into the car Dungee said to Hobbs, "Did you get the money, man?" Hobbs replied, "I got some of it, but I could not get all of it." They left Michigan Avenue and went to the outer drive. Dungee said to Brown, "Now, you don't have to worry. I will let you have the money to pay for your car." They drove south to Thirty-first Street and then west on Forty-third Street to a tavern where they ordered a drink and Hobbs and Dungee went into the men's bathroom. After coming out they all had a drink and then the three went to the bathroom where Dungee gave Brown about $260 or $270 and said, "This will take care of the car now." Brown took the money and said, "O.K. man." They then got in the car and drove to the Forty-second Street block on South Park where Hobbs got out. They then came back on South Park to Forty-sixth where Dungee got out and Brown went home. The above facts appear from a statement signed by Alcover Brown at the police station at 11:50 A.M., December 20, 1946.

By stipulation it appears that the robbery occurred at about 12:45 A.M., December 19, 1946; that $898.49 was taken from the care and custody of the cashier in the main cafe in the Palmer House and was the property of the Hilton Hotels Corporation, a corporation; that at the time of the robbery the doors were locked and four customers were still in the place; that Hobbs and Dungee entered the cafe from the basement stairway, covered the customers and directed them all into the washroom; that

the bartender saw Dungee with a gun in his hand and saw Hobbs near the cashier's cage and saw him pick up the bundle of bills.

On the same day Brown gave his statement Hobbs also made a statement at 1 P.M. in the police station. Brown was present and heard what Hobbs said. He remained silent during the entire statement. Brown was then asked if everything Hobbs stated was true. He answered, "No, I did not know anything about the robbery in the beginning. I was doing Mark [Dungee] a favor." Brown was then asked, "After you [Alcover Brown] read this statement and find it the truth with the corrections made, will you sign it?" He answered, "Yes," and then signed the statement. In this statement Hobbs said that when Dungee called for him at about twelve o'clock he got in the automobile and Cove (indicating Alcover Brown) and Dungee were both in the auto; that he told Cove to go north to the loop; that while they were driving they were planning the robbery and Cove said, "There was not going to be any gun play," and that was agreed. Hobbs and Dungee got out of the car before the robbery, went into the hotel where the cashier and four customers were, herded them into the washroom and took the money from the cashier's drawer, went out and waited a second or two when Brown drove up in the auto and they got in. While they were driving away it was said they would find someplace to divide the money and they drove to a tavern on Forty-third Street and all went to the washroom and divided the money, Hobbs receiving about $284 for his share. Two guns were used in the robbery, a blue steel automatic and a Luger-type pistol. The automatic was handed to Hobbs in the back seat by Dungee while they were driving downtown. The statement shows Hobbs was asked, "Did you talk to Alcover Brown about this robbery before you got to the Palmer House?" His answer was "Yes." He then said, "We talked about how we were

going about the robbery, and this man here [indicating Mark Dungee] gave me the automatic and he said he would use the other pistol." Both guns were in the automobile when Hobbs got in.

The Luger pistol was found in Brown's dresser drawer the day following the robbery. Dungee states he put it there after the robbery without Brown's knowledge and that it belonged to him. He was a friend of the Browns and had been for more than a year. He frequently visited in their home and the day after the robbery spent more than an hour with Mrs. Brown in their home in Brown's absence. During that period he was in all rooms of the house and it was during that time he claims to have slipped the gun in Brown's drawer.

Brown, Hobbs and Dungee all testified at the hearing and each stated that there had been no conversation of any kind with Brown with respect to a robbery. Hobbs testified that when he first got in the car before the robbery Dungee told Brown that he was to take Hobbs to the Palmer House to meet some girls; some girls they were to meet after 11:30. Hobbs also said that he had no gun in his hand while in the car before the robbery. He also testified that he and Dungee divided the money in the washroom. He denied giving Brown any money at all, the proceeds of the robbery, and stated that none was given Brown in his presence. While Hobbs' testimony contradicted in some particulars his written statement, he nevertheless testified that he gave the police the facts mentioned therein at the time it was made.

In Dungee's testimony he said there was no conversation at any time in Brown's presence with respect to any robbery and that no robbery was planned in Brown's presence; that after the robbery was committed there was no conversation in Brown's presence with reference to the robbery or the taking of any money from anybody; that no money was given Brown that night but the following

day he gave Brown $250 or $260; that Brown asked him what it was for and he said, "Pay the debts. This sum of money I owe you." He testified that he owed Brown pretty close to $200. He said he got a little over $300 from the robbery; that when he was arrested the police took from him about $250 which was part of the proceeds of the robbery; that before the robbery he had $10 or $20. This testimony is inconsistent. If Dungee had $20 before the robbery and his share of the robbery was $300, and if he paid Brown $260 or $270 of that sum the following day, he would not have had $250 left, which was the amount found on him when he was thereafter arrested.

Brown testified that there was no robbery mentioned to him either before or after the commission of the crime; that he took the men downtown to pick up some girls at that tavern. He testified that he did not know that either man had a gun and the first time he saw the gun was at the police station; that he had never seen it in their home and had never had it there; that Dungee owed him something like $200; that when Dungee gave him the money, he asked what it was for and Dungee said, "You can pay your car note and pay your debt." He testified that he did not know that the money was from the Palmer House robbery. He testified that he at all times told the police he did not know anything about the robbery and that he did not participate in it. He denied having committed the robbery with the gun or that he had any part in a robbery; that the first time he learned of the robbery having been committed was the next night after he came home from work and read the paper. In another place he said Dungee told him the money paid him was to take care of "your bills and the money I owe you. Now you can pay your car note that you have been harping about."

Brown's wife testified in his behalf and corroborated his statement that he never had any gun; that Dungee was a friend of theirs; that on the night of the robbery she

visited the home of Mr. and Mrs. Richardson where Brown was to pick her up about twelve; that he was late and did not pick her up until a little before one; that Dungee was in the car and they left him off at Forty-sixth and South Park. She stated that Dungee was in their home the next day but she did not see any gun in his possession; that he was in their home about two hours.

In talking with the officers at the police station Brown always said he took no part in the robbery and did not know that a robbery was going to be committed. After Hobbs had made his statement Brown was asked if everything Hobbs stated was the truth. The only thing in the statement Brown mentioned as being untrue was that concerning his knowledge of the robbery when he said, "I did not know anything about the robbery in the beginning." He was not asked what his words "in the beginning" meant nor did he say what they meant. He no doubt referred to the beginning as being the time when Hobbs joined him and Dungee and they started downtown. We do not see how the beginning could have been later than that. He could have learned of the plans, or could have participated in forming them, between that beginning period and the time when Hobbs and Dungee left his car to put the plans into action. Stating that he knew nothing of the robbery in the beginning fell far short of denying all of the statements made by Hobbs which Brown signed and could hardly be construed as meaning that at no time prior to the robbery did he learn of the intention to commit it.

The accused all say Brown was told they were going to the Palmer House to pick up some girls. From the time Hobbs and Dungee left the Brown car and returned only a few minutes elapsed, just long enough for him to circle the block twice. After the two re-entered Brown's car, no question was asked about the girls nor was any statement made relative to them. It seems strange that

if Brown thought the purpose of their trip downtown was to pick up some girls, he would not have inquired as to why the object of their visit had failed.

The record shows that none of the parties whose statements were taken at the police station were abused in any way nor were they threatened with violence or promised immunity or leniency, but the statements were all given freely and voluntarily.

The record shows that plaintiff in error, Brown, was formerly convicted in the Criminal Court of Cook County of robbery and that on April 23, 1937, he was sentenced to the Illinois State Penitentiary at Joliet, Illinois. Oscar Hobbs was also convicted of prior robbery and served a sentence therefor.

Mere negative acquiescence is not sufficient to constitute a person a principal, but there must be something in the evidence showing a design to incite or in some manner aid, abet or assist in the crime, but if the circumstances show a common design to do the unlawful act, to which all assent, then whatever is done in furtherance of the original design is the act of all, and it is not necessary that each one shall take an active part in the commission of the crime. *People* v. *Powers*, 293 Ill. 600; *People* v. *Marx*, 291 Ill. 40.

Brown's individual signed statement and Hobbs' statement signed by Brown which definitely implicated him in the planning of the robbery and which he indicated was true, except that he knew nothing of the robbery in the beginning, show clearly that his conduct was of an affirmative nature and that he did aid, abet or assist in the commission of the crime.

An admission, in criminal law, is a statement by the accused of a fact or facts pertinent to the issue, and tending, in connection with proof of other facts, to prove his guilt; but an admission is not, alone, sufficient to authorize a conviction. (*People* v. *Nitti*, 312 Ill. 73.) An admission

may be implied from the conduct of a party charged with crime who remains silent when statements are made in his presence and hearing implicating him in its commission, when the circumstances afford him an opportunity to reply and where a man similarly situated would ordinarily deny the imputation. (*People* v. *Lehne,* 359 Ill. 631.) Where a crime has been committed, the admissions of a party charged with the crime, deliberately made, are always admissible for the purpose of showing the guilt of the accused. (*Andrews* v. *People,* 117 Ill. 195.) It is only when the admissions are deliberately made and precisely identified that the evidence afforded by them is of a satisfactory character. (*People* v. *Christocakos,* 357 Ill. 599.) The law is well established in this State that since the accused can expressly admit away his whole case by pleading guilty, he can admit away any part of it. *People* v. *Pilewski,* 295 Ill. 58.

The admissions of Brown do not stand alone as evidence against him. The facts concerning his participation in what was done immediately before and immediately after the robbery are admitted. In his brief and argument it is said: "The cafe or saloon part of the Palmer House in Chicago, was held up by Hobbs and Dungee on December 19, 1946. * * * Brown drove them to and from the scene and received part of the proceeds." His only contention is that he did not know a robbery was to be committed. In his argument he further says, "There can be no question as to the guilt of Hobbs and Dungee, they committed the holdup. There can be no question but what Brown rendered valuable assistance on the outside. If Brown did this knowing the purpose of the trip, Brown was also a principal, but if Brown had no guilty knowledge, he is innocent. The question submitted boils itself down to this—is there sufficient proper evidence to show that Brown had the requisite knowledge in the face of his denial?"

From all the facts and circumstances in the record we are satisfied that Brown knew the robbery was to be committed and that he participated therein and is guilty as a principal. The judgment of the lower court is therefore affirmed.

*Judgment affirmed.*