No. 19,329.

VERNON LINCOLN JOHNSON *v*. THE PEOPLE
OF THE STATE OF COLORADO.
(358 P. [2d] 873)

Decided January 23, 1961.

Messrs. DICKERSON, MORRISSEY AND DWYER, Mr. H. MALCOLM MACKAY, Mr. MICHAEL F. MORRISSEY, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. ROBERT G. PIERCE, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

IN the first count of an information filed in the trial court, plaintiff in error, to whom we will refer as defendant, was accused of first degree murder in that he, allegedly, did:

" * * * wilfully, unlawfully, feloniously and deliberately and of his premeditated malice aforethought, kill and murder one Raymond J. McMaster * * *."

A second count alleged that defendant:

" * * * did make an assault upon Nicholas Lenarz, and then and there feloniously and violently, and by force and intimidation, did rob, seize, steal, take and carry away money and personal property from and against the will of said Nicholas Lenarz; and that said Vernon Lincoln Johnson when he so robbed the said Nicholas Lenarz had two confederates, namely, Revilo Robert Sides and Vernon Sides who were then and there armed with dangerous weapons, with intent, if resisted, to maim, wound or kill the said Nicholas Lenarz and any other person, and said Vernon Lincoln Johnson and said confederates did shoot and kill one Raymond J. McMaster with said dangerous weapons in the perpetration of said robbery."

Defendant was granted a separate trial, upon the conclusion of which the jury returned a verdict on each count of the information finding defendant not guilty of murder as charged in the first count, and guilty of aggravated robbery as charged in the second count. Motion for a new trial was filed and denied. The defendant was sentenced to a term of not less than twenty-five years, to life, in the penitentiary. He is here on writ of error to review that judgment.

Upon the trial of the case the only evidence presented was that offered by the prosecution, the defendant neither taking the stand in his own defense nor offering testimony of other persons.

The evidence thus received established that on the late evening of November 8, 1958, Vernon Sides and his brother Revilo met defendant, a long-time acquaintance, in Boulder, Colorado. Defendant was driving a Hudson automobile. At the meeting in Boulder it was agreed that they should meet "at the airport." They met as arranged and from the airport drove to The Grange where the car being driven by the Sides brothers was left. One of the brothers transferred a bag of burglary tools, which included masks, guns, coveralls and caps for use as disguises, from the Sides car into the trunk of the Hudson belonging to defendant. The three men then drove to the town of Lyons about fourteen miles northwest of Boulder where they planned to commit a burglary. Upon arriving at Lyons the defendant and Vernon Sides got out of the car and looked over a business establishment known as the "Foothills" with the intent to make it the subject of the contemplated burglary. After spending considerable time investigating the place it was decided that the Foothills was not a very good risk. They got in the car and drove through the town, turned around and started to drive out of town in an easterly direction. However, at the request of Vernon Sides the defendant, who was driving, turned back and took the Sides brothers to the edge of town. Here the brothers got out of the

car, removed the bag of burglary tools from the trunk, and, carrying the bag walked some distance down the railroad tracks leading into town. They left the bag of tools in a field across the street from an establishment known as the "Hideout." They then proceeded into town where they "cased" a drugstore and a lumberyard before returning to the field where the bag had been left. They there put on coveralls over their clothing in preparation for the robbery of the Hideout.

Vernon Sides went to the back entrance of the building where he unexpectedly encountered one Mrs. Darner, a cook, and her son who were leaving the premises to go home. It was approximately 3:00 o'clock in the morning of November 9, 1958. At gunpoint Vernon Sides ordered them back into the building where Nick Lenarz, the bartender, and his son were about to close up the place. Vernon Sides took the money from the cash register and a billfold from Lenarz. He then ordered the latter to walk outside with his hands up, turn around and re-enter the place. Revilo Sides, who was waiting across the street, upon observing this signal, hurried over "to help his brother." Both men wore masks. The victims were bound with adhesive tape furnished by the holdups. The robbers then left the scene in a Packard automobile belonging to the bartender from whom they took the ignition key. The record does not disclose how much time elapsed between the time defendant let the Sides brothers out of the car and the time of the actual robbery, but from consideration of all that was done in the matter of looking over places to enter it must have been a considerable time.

In the stolen car the Sides brothers drove south toward Boulder, and along the way abandoned the car by the side of the road. They then started hiking through the fields. A short time later they saw the lights of a car approaching on the highway, which Vernon Sides flagged down, and it proving to be defendant in the Hudson car, Revilo joined his brother and the three of them

continued toward Boulder in the Hudson with defendant driving. Once in the car the brothers removed the coveralls.

Meanwhile police had been notified of the robbery at Lyons and roadblocks had been set up. Just north of Boulder the Hudson passed a police car parked by the side of the road. Officers McMaster and Grothjan, who were manning the car, followed the Hudson and signalled for it to stop. Both officers got out. Pursuant to direction from the police, defendant got out of the Hudson and held up his hands. Officer McMaster asked the other officer to cover defendant and he started around in front of the Hudson, at which point he was shot down by Revilo Sides who fired four bullets into his body causing his death. When the shooting started defendant moved away and officer Grothjan fired a shot over his head and emptied his revolver firing into the Hudson. A voice from the rear said, "Drop your gun, I've got you covered." The officer turned quickly, saw defendant near a fence which ran parallel to the highway, and fired his riot gun hitting him in the shoulder. Officer Grothjan then jumped into the ditch alongside the road to reload his revolver. One of the Sides brothers started the Hudson car which moved forward, stalled, started again and was driven off, disappearing in a westerly direction. The Sides brothers escaped from the scene, but were later arrested. After several days defendant surrendered to law officers and was taken to Boulder. Upon being questioned, his only pertinent statement was that he was driving the car. Revilo Sides, the man who fired the fatal shots, admitted that the district attorney had made him a promise if he would testify, and it was by his testimony that the events leading up to the robbery were placed before the jury.

Bearing directly upon the questions hereinafter considered, it is necessary to refer in detail to the specific testimony of Revilo Sides as a witness for the people concerning what happened between the witness, Vernon

Sides, and the defendant after it was determined that the Foothills was not a good risk. Revilo Sides testified as follows:

"Q. Vernon Johnson didn't know that you and your brother were going to stick up a place with guns, did he, Mr. Sides? A. No. No, we had intentions of pulling a burglary, and not an armed robbery on that night. Q. Then the defendant, Mr. Johnson, knew nothing about any intention of yours, to use your expression, to pull an armed robbery? He knew nothing about it? A. No, and he didn't want anything to do with burglary after the Foothills wasn't up to par, you might say. Q. Yes, sir. He didn't want anything to do with any burglary, that's correct, you said, isn't it? A. That's right.

\* \* \*

"Q. All right, Mr. Sides. Two things: The defendant didn't know about any armed robbery, you said, and the defendant, Mr. Johnson, declined to have anything to do with any burglary, and that's correct, isn't it? I mean you have stated that?

\* \* \*

"A. He didn't want anything to do with a burglary after we started to leave Lyons. He knew nothing about an armed robbery since we didn't know we were going to pull an armed robbery anyhow, and the first I knew about that was when the man came out of the door and held his hands up, and I run across the street."

Concerning what happened after the robbery was committed and after the two admitted participants had been picked up by defendant on the highway leading to Boulder, Revilo testified:

"Q. And how did this defendant learn that you had gone through an armed robbery, do you know? A. He knew about it by the time I got back into the car, and he was kind of nervous over it.

\* \* \*

"Q. Did you know that he requested you and your brother to get out of the car? A. Yes.

\* \* \*

"Q. Very well, Mr. Sides. When, at what point, did Vernon Johnson ask you and your brother to get out of the car? A. After we had gotten into the car and driven down the road a'ways. Actual minutes, I don't know, since we got into the car and drove down, my brother had time to get off his coveralls and put them in the bag, and put the bag in the front, and I was taking my coveralls off when that was taking place.

\* \* \*

"Q. What was done, or said, when he told you to get out of this car? What happened? A. My brother asked him to drive on. Q. Now, Mr. Sides, isn't it true that your brother ordered him to drive on?"

(At this point objection was made, at the conclusion of which the question was read to the witness by the reporter.)

"Q. That's right, isn't it, sir? A. As an actual order, I don't know. It could be interpreted as such. Q. As an order. Did Mr. Johnson say why he wanted you boys to get out of the car? A. No, not that I remember. \* \* \* "

Counsel for defendant tendered an instruction which they asserted covered their theory of the case. It was refused by the trial court and no instruction was given which directed the attention of the jury to any particular theory of defense relied on by defendant. At no point in the instructions was the jury informed concerning the law applicable to a situation where in fact a conspirator in a plot to commit a burglary actually and in good faith withdraws from participation in the commission of that offense prior to its consummation. While the instruction tendered on behalf of defendant did not specifically deal with this theory of defense, it was nevertheless involved in the tendered instruction. It is apparent from the record that defendant relied on the evidence above quoted to support the defense that he had abandoned the plot to commit a burglary and had withdrawn from participation in the criminal activity there-

after carried out by the two brothers. The circumstances that the burglary tools were removed from defendant's car by the brothers; that the brothers walked down the railroad track toward the town and following the robbery made their escape in an automobile stolen from the victim, would tend in a measure to substantiate this theory of defense. We do not mean to infer that the circumstances thus presented would be conclusive on the question, but they did present a question for determination by the jury when considered with the undisputed testimony of the witness Sides.

 It is axiomatic that the accused in a criminal case is entitled to an instruction based on his theory of the case. In *Payne v. People,* 110 Colo. 236, 132 P. (2d) 441, it is stated, inter alia:

" * * * In any event the law, which makes every provision for the protection of even possible innocence, has neither overlooked such a situation as here confronts us nor issued its mandate in equivocal language. 'No matter how improbable or unreasonable the contention, defendant was entitled to an appropriate instruction upon the hypothesis that it might be true.' *Jabich v. People,* 58 Colo. 175, 143 Pac. 1092; *Crawford v. People,* 12 Colo. 290, 293, 20 Pac. 769; *Huffman v. People,* 96 Colo. 80, 84, 39 P. (2d) 788.

"It must be borne in mind that the 'contention' referred to must be one grounded upon evidence, neither a mere fanciful invention of counsel nor one involving an impossibility. *Van Wyk v. People,* 45 Colo. 1, 18, 99 Pac. 1009."

No instruction was given by the trial court embodying the theory of defendant, and in the absence thereof a new trial must be had.

 Instruction No. 11, given by the trial court, was the only one in which an accessory was defined. It correctly defined an accessory before the fact, but in addition thereto it contained the following statement: "An accessory during the fact is a person who stands by,

without interfering or giving such help as he may in his power to prevent a criminal offense from being committed." The trial court did not submit any form of verdict, although requested to do so, on the question of whether defendant was an "accessory during the fact," and thus it cannot be said with certainty whether the guilty verdict was grounded on a finding that defendant was an accessory during the fact, or an accessory under such circumstances as to be deemed and considered as a principal and punished as such. It is not the law that an accessory during the fact shall be deemed and considered as a principal and punished as such. Participation in a criminal act as an accessory during the fact "is a distinct offense, and the penalty therefor is different from the penalty prescribed for the principal." *Stewart v. People,* 83 Colo. 289, 264 Pac. 720. The instruction should not have indicated that there was no distinction in law between an accessory before the fact and an accessory during the fact. The court could not legally have passed sentence of twenty-five years imprisonment if the verdict was based on a finding that defendant was an accessory *during* the fact.

■ C.R.S. 1953, 40-1-13, in pertinent part provides that:

" * * * Any person found guilty of being an accessory during or after the fact, shall be imprisoned for any term not exceeding two years, and fined in a sum not exceeding five hundred dollars, in the discretion of the court * * *."

Moreover, in *Miller v. People,* 104 Colo. 622, 94 P. (2d) 125, it was held that one convicted as such accessory must be sentenced to the county jail, rather than to the penitentiary. In the instant case we do not know whether the guilty verdict returned by the jury was based on the court's definition of accessory during the fact, since no distinction was made between the two forms of accessory. Without that knowledge the court could not pass a valid sentence.

The judgment is reversed and the cause remanded with directions to grant a new trial.

Mr. Justice Doyle dissents.

Mr. Justice McWilliams did not participate.

Mr. Justice Doyle dissenting:

I respectfully dissent. I shall briefly set forth the reasons in support of my disagreement.

The theory upon which this defendant was accused of the crimes of murder and robbery was that he admittedly became a party to an unlawful alliance with his co-defendants looking to the commission of burglaries. The Sides brothers were equipped with burglary tools, masks, coveralls and guns, and although the defendant claims that he was never a willing participant in any robbery, this contention is hard to reconcile with his other activities. The parties went to Lyons, Colorado, and made a preliminary investigation looking to such burglary. Later the defendant separated from the Sides brothers and they removed the equipment from his car. If the defendant had at that stage departed from the scene there would be real substance to his contention that he broke off his relationship with the co-defendants. He did not do this. He remained in the general area and furnished the transportation away from the area of the crime after the Sides brothers had parked the stolen car in a side road. He could, of course, maintain that his post-robbery meeting with the Sides brothers was coincidence. However, this was a question of fact. Furthermore, at the scene of the killing there is disputed evidence as to whether he was a willing participant in that transaction. Unquestionably the jury had some doubt as to whether he had in good faith withdrawn from the events leading to the killing, since they found him not guilty of that charge. This result itself would indicate that there was no inherent prejudice against this defendant, and indi-

cates that he thereby received a concession or break which renders the present result substantially just.

I.

It is apparent from the facts that a fabric of evidence existed to support the people's theory that the defendant aided and abetted the commission of the robbery and his contention that he intended at most to commit a burglary and that he did not consent to the perpetration of a robbery is not valid because it is fundamental that the common purpose need not be to commit the particular crime which is ultimately committed in order to render one guilty as an accessory before the fact. If the principals committed a crime and the related crime is a natural or probable consequence of the unlawful association, the defendant is responsible under the law as an accessory before the fact as defined in our statutes, C.R.S. '53, 40-1-12, C.J.S. 155, sec. 87, *Criminal Law.* See *State v. Kelly,* 243 N.C. 177, 90 S.E. (2d) 241; *People v. Hobbs,* 400 Ill. 143, 79 N.E. (2d) 202. Cf. *Mulligan v. People,* 68 Colo. 17, 189 Pac. 5.

II.

With respect to the failure to instruct on the defendant's theory of the case, I submit that the court committed no error in this regard. The tendered instruction which purports to set forth the defendant's theory is as follows:

"You are instructed that to convict Vernon Johnson of either the crime of robbery or murder, every element of the crime of robbery must be proved against him beyond a reasonable doubt, including the element of intent to rob, and if you find that Vernon Johnson formed no intent to rob the Hideout Bar at Lyons, Colorado, then you must find Vernon Johnson not guilty of robbery and not guilty of murder."

The above could not have been given because it required the defendant Johnson to have entertained a specific intent to rob and, as noted above, this was not necessary. It was sufficient for the jury to find beyond

a reasonable doubt that the defendant was a party to the unlawful transaction having for its purpose the commission of a burglary. Unquestionably Johnson was originally a party to this purpose and there is evidence from which the jury could be satisfied that he continued to be a part of the unlawful scheme and that he did not repudiate it, even after discovering that a robbery rather than a burglary occurred. The only instruction embodying the defendant's theory of the case that the court could have given consistent with fundamental principles of criminal law was one which would have instructed the jury to acquit the defendant if it found that he had withdrawn and had repudiated the unlawful enterprise prior to the robbery, or if it entertained a reasonable doubt as to such withdrawal. No such instruction was tendered and no duty rested upon the court to so instruct on its own motion. It is to be noted also that the record does not contain testimony reflecting the exact intent of the defendant. Consequently, I do not agree that the failure of the court to tailor an instruction embodying such a theory was indicated.

### III.

A study of the court's instructions reveals that the law with respect to principals and accessories was fully expounded. The majority criticizes Instruction No. 11 which defined an accessory before the fact and also went ahead and defined accessory during the fact. However, it was quite clear in requiring the jury to find beyond a reasonable doubt that the defendant at bar "stood by and aided, abetted or assisted in the perpetration of the robbery." The clarity of the instruction, notwithstanding the inadvertent inclusion by the court of accessory during the fact can only be appreciated by a study of the instruction as a whole. It reads:

"You are instructed that an accessory is he or she who stands by and aids, abets, or assists, or who, not being present aiding, abetting, or assisting, hath advised and encouraged the perpetration of the crime. He or she

who thus aids, abets, or assists, advises or encourages, shall be deemed and considered as principal and punished accordingly. An accessory during the fact is a person who stands by, without interfering or giving such help as he may in his power to prevent a criminal offense from being committed. In this case, if you find and believe from the evidence beyond a reasonable doubt that either Revilo Robert Sides or Vernon Sides was the principal perpetrator of the robbery of the Hideout cafe-tavern at Lyons, Colorado, and if you should further find and believe from the evidence beyond a reasonable doubt that the defendant, Vernon Lincoln Johnson, stood by and aided, abetted, or assisted in the perpetration of such offense, then and in either case, the defendant, Vernon Lincoln Johnson, would be deemed and considered as a principal in said robbery."

A fair reading of the above instructions could lead to only one conclusion and that is that the definition of accessory during the fact is surplusage. The defendant was not present during the robbery, hence could not have stood by without interfering to prevent the commission of the crime, and the jury obviously discarded any thought of his being an accessory during the fact as defined in the instruction, and starting with the words "in this case" unquestionably required the jury to find that Johnson aided and abetted the robbery.

The case of *Stewart v. People,* 83 Colo. 289, 264 Pac. 720, condemned a somewhat similar instruction as being confusing, but in the *Stewart* case the jury was told that if it believed "beyond a reasonable doubt from all the evidence in this case, that the defendant was an accessory, *as above defined, * * * "* Notwithstanding the confusion, the Court held that the instruction, although erroneous, was not prejudicial. The significant language is quoted on p. 294 of 83 Colo.:

"Instruction No. 3, so far as it relates to an accessory during the fact, is erroneous. But, in view of the facts disclosed by the record, that part of the instruction

could not have misled the jury. That the defendant was guilty of the offenses with which he was charged, was proven by conclusive evidence. The defendant offered no evidence to contradict it, or that even tended to contradict it, in any particular. It is not every error in an instruction that requires a reversal. C.L. sec. 7103. No other verdict could have been rendered by a jury having a due regard for its oath. The substantial rights of the defendant were not prejudiced. No reversible error was committed in giving the instruction."

*A fortiori* Instruction No. 11 was not prejudicial since it was not an erroneous instruction. The defendant in this case as in the *Stewart* case "offered" no evidence to contradict it, and I am satisfied that no prejudicial error was committed by the trial court. My reaction from reading the record is that the accused received an excellent defense and a fair and impartial trial and that the judgment should be affirmed.