THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALFRED MORGAN, Defendant-Appellant.

First District (5th Division)    No. 61610

Opinion filed June 11, 1976.

James J. Doherty, Public Defender, of Chicago (Robert P. Isaacson, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, David A. Novoselsky, and Labrenda E. White, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendant was convicted of accountability for murder and armed robbery of Theodore Fletcher (Ill. Rev. Stat. 1971, ch. 38, pars. 5—1, 5—2, 5—3, 9—1, 18—2) and sentenced to a term of 20 to 25 years for each offense, the sentences to run concurrently. On appeal he contends that: (1) he was arrested without probable cause, (2) he did not effectively waive his right to counsel during questioning following his arrest, (3) he was not proved guilty of accountability for murder and armed robbery beyond a reasonable doubt, and (4) he cannot be convicted for two offenses derived from the same act.

At noon on September 9, 1972, defendant was arrested and was transported to the Robbins Police Station for questioning concerning the death of Theodore Fletcher. Before his trial commenced, defendant filed a motion to suppress a statement he gave at 8:10 p.m. at the police station. He alleged that his statement was not given voluntarily because he was unduly influenced and coerced into waiving his right to counsel and to remain silent.

The following pertinent evidence was heard on the motion to suppress.

*For the State*

*Louis Gasperec*

He is an Assistant State's Attorney. On September 9, 1972, he was summoned to the Robbins Police Station in order to interview individuals regarding the death of Theodore Fletcher. He arrived there between 3:15 and 3:30 p.m. and saw defendant at 5 p.m. He advised defendant of his

*Miranda* rights, which defendant indicated he understood. He told defendant that Mae Liza Lee had given a statement implicating him in the events surrounding Fletcher's death. At 7:40 p.m. in the presence of Sergeant Frederick Pennix, Detective Eugene Grant, another police officer, and a court reporter, he began questioning defendant. Again he advised defendant of his rights. Defendant initially indicated that he did not want an attorney with him while making his statement and then became confused about having an attorney during his statement and having an attorney in court. Finally, when he was asked, "Do you want to give a statement with a lawyer?" defendant replied, "Right." Gasperec then stopped his questioning and tried to obtain an assistant public defender for defendant.

Approximately 20 to 30 minutes later, one of the police officers at the station approached him and indicated that defendant wanted to talk to him. Although he had been unable to find an attorney for defendant, he returned at 8:10 p.m. He thereupon resumed the questioning without informing defendant that he had been unable to get him an attorney, but only after again advising defendant of his *Miranda* rights. He asked defendant whether he wanted a lawyer and defendant replied that he wanted "to tell it the way it was" and that a lawyer would merely confuse him.

He testified that both the 7:40 and the 8:10 p.m. transcripts accurately reflected what was said. He denied ever threatening defendant.

*Emmett Smith*

He is a shorthand reporter for the State's Attorney's office and transcribed the exchanges between Gasperec and defendant at the Robbins Police Station. Defendant never complained about physical abuse while at the police station.

*Lawrence Moore, Robbins Police Officer*

He has been a police officer for 2½ years. On September 9, 1972 he was present at the Robbins Police Station with Gasperec and Police Officers Harris, Pennix and Grant. After the initial questioning of defendant was suspended to permit Gasperec to obtain legal counsel for defendant, defendant asked Moore if he could finish his statement. Moore replied that he did not need to finish his statement since Mae Liza Lee already implicated him in the killing of Theodore Fletcher. When Gasperec got off the phone, Moore denied beating or assaulting defendant, nor did he see anyone coerce or unduly influence defendant.

*Sergeant Nathaniel Harris, Robbins Police Officer*

He has been a police officer for 1½ years. He substantially corroborated Moore's testimony concerning the absence of any mistreatment of

defendant. Neither he nor anyone else told defendant that he did not need an attorney to make his statement after the initial questioning was suspended.

*Eugene Grant and Sergeant F. Pennix, Robbins Police Officers*

They substantially corroborated the testimony of Assistant State's Attorney Gasperec, Officer Moore and Officer Harris.

*Howard Barnard*

He is a correctional officer for the Cook County Sheriff's Office and works at the Cook County Jail. Defendant did not complain of any injuries when he was admitted to the jail on September 10, 1972.

*For defendant*

*Alfred Morgan, on his own behalf*

On September 9, 1972, at about 12 noon, he was arrested and taken to the Robbins Police Station, where he was questioned by police officials concerning the death of Theodore Fletcher. They did not advise him of his constitutional rights while questioning him. He stated that he did not know who had killed Theodore Fletcher. Between 4 and 4:30 p.m., Assistant State's Attorney Louis Gasperec arrived at the Robbins Police Station. When defendant refused to give a statement concerning Theodore Fletcher's death, Gasperec slammed his own hand on an adjacent desk and used profanity.

Between 6:30 and 7 p.m., defendant was told that Mae Liza Lee had made a statement implicating him in the killing of Fletcher. Nevertheless, he refused to make a statement. Between 7:30 and 7:40 p.m., Gasperec read defendant his constitutional rights in anticipation of some questioning, whereupon defendant declared that he wanted legal counsel. At that point, Officers Grant, Harris and Moore took defendant from the room where he was being questioned. They told him that he did not need an attorney, that an attorney would only confuse him, that if an attorney was not present his statement would not hold up in court, and that, in any event, he was not going to be involved in the case. After five or ten minutes he was taken back for questioning. Moore pushed him, struck him with an open hand, and caused his head to hit against the wall. Gasperec then returned and, without informing defendant about the outcome of his request for legal counsel, asked him if he would give a statement. When he again refused, Gasperec threatened to release the other suspects, have him charged with robbery and murder, and have a prison sentence of 50 to 100 years imposed. Relying on the assurances of Moore and Harris that an attorney would only confuse him and that he would not be charged with any crimes, he made a statement at 8:10 p.m.

His statement indicated that he waived his *Miranda* rights because he felt that he was involved in Theodore Fletcher's death, that he wanted to talk about it now, and that a lawyer would only confuse him, and that he

had not been mistreated, influenced, or threatened. The motion to suppress was denied and the following pertinent evidence was adduced at trial.

*For the State*

*Mae Liza Lee*

In September, 1972, she lived in an apartment in Robbins, Illinois, with defendant, Cecilia Walker, Theodore Fletcher, the victim in the instant case, and her children. Fletcher had been living with her since March, 1972. She slept in the living room, Fletcher in one bedroom, and Walker and defendant in another bedroom. On September 8, 1972, at about 10 p.m., a man called A. D. drove her and Wilbur Jackson to a liquor store in Harvey, Illinois. She and Jackson stayed in the car while A. D. went into the store. They were joined by a man known to her as Upsicola. Shortly thereafter, a man approached the car and stated that Fletcher had some money. Jackson and Upsicola said that they would get the money. As the men were talking, she saw Fletcher enter the liquor store but did not see him leave.

When A. D. returned, he drove her, Jackson, and Upsicola back to Harvey. On their arrival at about 11 p.m., they had a conference in her yard with defendant and another man called Mississippi Slim. The men discussed obtaining some money, although the name of the person from whom they would obtain the money was not mentioned. There was also mention of a gun, although she did not see anyone with a gun.

After the conference, defendant left the yard and went across the street. She went inside with Jackson. They lay down on the couch, Fletcher, who had apparently returned from the liquor store, spread a blanket over them and sat on another couch with Cecilia Walker. She fell asleep. Later she was awakened by loud laughter. She saw Mississippi Slim, Upsicola, Jackson and defendant dividing some money. Jackson said that he had not meant to hit "the old man" but "just a little sport." Upsicola said, "Don't be caught with the big bills."

She then went back to sleep. Later she was awakened by Walker, who told her that a man named James Wilkerson wanted her at the window. She went outside and saw Fletcher lying on the ground. His body was bloody, but he was still alive. He did not speak, however. She saw defendant inside the house next to the door where Fletcher was lying. Later she was arrested and taken to the Robbins Police Station where she made a statement to the police. She never saw anyone hit or beat Fletcher.

*Dr. Pascual Culala*

He is a physician and pathologist. In his opinion, blows from blunt objects, including a hammer, a board, and a brick, found near Fletcher's body were capable of causing Fletcher's death.

*For defendant*

*Alfred Morgan on his own behalf*

On September 8, 1972, at approximately 9 a.m., he was at Mae Liza Lee's apartment. She asked him whether he knew if Fletcher had received his check because Fletcher owed her two months rent and she needed some money. He said he didn't know. At about 11:30 or 12 a.m. he overheard a conversation between Mae Liza Lee and Cecilia Walker. Lee complained that Fletcher did not want to give her any money even though he might be getting his check that day.

Early in the afternoon, James Wilkerson and Ollie Lee, Mae Liza Lee's brother, arrived at the apartment. Ollie Lee, Mae Liza Lee, Walker and Wilkerson went into a bedroom while defendant was in the living room. Defendant overheard them planning to get Fletcher's money. For participating in the plan, each was supposed to obtain a designated share of Fletcher's money. Then Mae Liza Lee called defendant into the bedroom. Thereupon, Ollie Lee explained that he did not know how he would get the money, but "he would get it, if that's what it takes." The victim was to be taken to a canal. When Ollie Lee asked him if he would participate in the plan, he responded, "I don't want no part of it. I don't want no money, but I'll be there."

At about 7:30 p.m. he arrived at Olivia Campbell's house for a party. The party ended at about 1 a.m., but he stayed about 15 or 20 minutes more to help clean up. He then went to the Bel-Air Lounge, where he saw Fletcher and Walker. He bought Fletcher a shot of whiskey and a beer. Afterward, he accompanied Walker to Mae Liza Lee's apartment. Mae Liza Lee, Ollie Lee and Wilkerson were there. Fletcher arrived at the apartment about five or six minutes later and obtaining a bottle of whiskey from his bedroom, went outside. Defendant and everyone else in the apartment, followed Fletcher outside. Defendant intended to return to the Bel-Air Lounge, which was just across the street. However, before he had gone very far, he heard screaming and hollering. Turning around, he watched Ollie Lee hitting Fletcher with a hammer and Wilkerson hitting him with a board for about 10 to 20 minutes. Defendant, who was 15 feet away during this period, ran back and tried to stop Wilkerson and Lee, but without success. Lee slapped defendant and warned him not to say anything about the beating. Fletcher fell to the ground, whereupon Mae Liza Lee and Walker emptied his pockets, removing something dark. Defendant did not take any of Fletcher's money.

In the statement he gave at the Robbins Police Station on September 9, 1972, defendant described the beating of Theodore Fletcher in conformance with his testimony, but said nothing about his attempts to stop Ollie Lee and James Wilkerson from hitting the victim.

At trial, the State tendered a petition, which was granted, to give

immunity to Mae Liza Lee for any matter relating to the killing of Theodore Fletcher. At the close of all the evidence, the trial court held that the State had not proved beyond a reasonable doubt that the defendant actively participated in the murder and armed robbery of Theodore Fletcher, but declared that the defendant was guilty of murder and armed robbery of Fletcher on a theory of accountability. After a hearing in aggravation and mitigation, the sentences previously stated were imposed.

OPINION

■■ Defendant's first contention is that his arrest was not based on probable cause and that his subsequent statement was therefore inadmissible. It is well established that an issue not presented to or considered by the trial court cannot be raised for the first time on appeal. (*People v. Howell*, 60 Ill. 2d 117, 324 N.E.2d 403; *People v. Pickett*, 54 Ill. 2d 280, 296 N.E.2d 856.) Such a rule is necessary in order to avoid the delay and expense incident to appeals, reversals, and new trials on grounds which might have been corrected in the trial court if the issue had been properly raised at that level. (5 Am. Jur. 2d *Appeal and Error* §545 (1962).) In the instant case, defendant never challenged the legality of his arrest at trial nor has he now argued that the alleged substantial error denied him of his right to a fair and impartial trial. Accordingly, we may not properly consider it on appeal.

Defendant's second contention is that, after being advised of his *Miranda* rights, he did not effectively waive his right to the assistance of legal counsel during questioning following his arrest and that his subsequent statement was therefore inadmissible. The thrust of defendant's contention is that his interrogators had an affirmative duty to provide him with an attorney once he made the request and that all further interrogation was barred.

■■ In the instant case, defendant, while being subjected to custodial police interrogation, was advised of his *Miranda* rights and requested the assistance of counsel. At that point, in accordance with *Miranda*, the questioning was stopped, and Assistant State's Attorney Gasperec made an attempt to contact the public defender's office for the purpose of providing defendant with counsel. While Gasperec was calling, defendant, according to Officer Moore's testimony, indicated that he wanted to make a statement. Gasperec returned and, before questioning defendant, again advised him of his *Miranda* rights. There was conflicting testimony concerning physical mistreatment of, undue influence upon, and improper threats against defendant between the time when the initial questioning was stopped and when the subsequent questioning was commenced. Significantly, in the written transcript of the subsequent questioning, defendant expressly declared that he had not been physically

mistreated, unduly influenced or improperly threatened and waived all of his rights, including his right to legal counsel, because he felt that he was involved in the killing of Theodore Fletcher, wanted to talk about it, and would only be confused by an attorney.

In *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321, the court held that *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, should not be construed to create a *per se* proscription of indefinite duration upon further custodial interrogation of a defendant who asserts his right to remain silent. (Accord, *People v. Pittman*, 55 Ill. 2d 39, 302 N.E.2d 7.) We recognize that the case at bar involves a different right guaranteed by the Constitution and protected by *Miranda*, *i.e.*, the right to counsel. (See *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (footnote 7).) Nonetheless, we believe that the language in *Miranda* concerning the procedural safeguards to be used once a suspect invokes his right to counsel when viewed in light of the court's reasoning in *Mosley* and the specific facts of this case, did not bar further custodial interrogation.

In *Miranda*, the court stated that "[i]f the individual cannot obtain an attorney and he indicates that he wants one before speaking to the police, they must respect his decision to remain silent." (*Miranda v. Arizona*, 384 U. S. 436, 474, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1628.) The Court in *Mosley* reasoned:

> "At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Michigan v. Mosley*, 423 U.S. 96, 102-103, 46 L. Ed. 2d 313, 320-21, 96 S. Ct. 321 (1975).

Here, although defendant originally expressed a desire to speak to an attorney, he later specifically recanted and indicated that he did *not* want the advice of counsel before speaking to the police. At this point, we believe that the *Mosley* rationale should apply and that the sole remaining question for review was whether defendant's waiver was voluntarily given.

The finding of a trial court that a statement was voluntarily made will not be disturbed upon review unless it is contrary to the manifest weight of the evidence. (*People v. Prim*, 53 Ill. 2d 62, 289 N.E.2d 601, *cert.*

*denied*, 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731; *People v. Higgins*, 50 Ill. 2d 221, 278 N.E.2d 68, *cert. denied*, 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195.) We believe that the testimony of the interrogating attorney, the four policemen, the shorthand reporter, the jail attendant and the defendant's own recorded statements outweigh defendant's later testimony at the hearing on the motion to suppress, and, therefore, uphold the trial court's finding that the statements were voluntarily given.

■■ Defendant's third contention is that he was not proved guilty of accountability for murder and armed robbery beyond a reasonable doubt. The law is clear that a person may be held accountable for the conduct of another in certain limited circumstances. Section 5—2(c)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38, par. 5—2(c)(3)) provides:

> "A person is legally accountable for the conduct of another when:
>
> ❊ ❊ ❊
>
> (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. However, a person is not so accountable, unless the statute defining the offense provides otherwise, if:
>
> ❊ ❊ ❊
>
> (3) Before the commission of the offense, he terminates his effort to promote or facilitate such commission, and does one of the following: wholly deprives his prior efforts of effectiveness in such commission, or gives timely warning to the proper law enforcement authorities, or otherwise makes proper effort to prevent the commission of the offense."

Where one attaches himself to a group bent on illegal acts which are dangerous or homicidal in character, or which will probably or necessarily require the use of force and violence that could result in the taking of life unlawfully, he becomes accountable for any wrongdoings committed by other members of the group in furtherance of the common purpose, or as a natural or probable consequence thereof even though he did not actively participate in the overt act itself. (*People v. Rybka*, 16 Ill. 2d 394, 158 N.E.2d 17; *People v. Hobbs*, 400 Ill. 143, 79 N.E.2d 202.) Mere presence or negative acquiescence is not enough to make one a principal to a crime. (*People v. Washington*, 26 Ill. 2d 207, 186 N.E.2d 259.) However, a person may aid or abet without actively participating in the overt act and if the proof shows that he was present at the commission of the crime without disapproving or opposing it, the trier of fact may consider this conduct in connection with other circumstances and thereby

reach a conclusion that such person assented to the commission of the crime, lent to it his countenance and approval, and was thereby aiding and abetting it. *People v. Torres*, 19 Ill. 2d 497, 167 N.E.2d 412; see *People v. Tate*, 63 Ill. 2d 105, 345 N.E.2d 480.

■■ In the instant case, the record indicates that defendant attended or overheard two meetings, one according to Mae Liza Lee's testimony and one according to his own, during which the forceful taking of Theodore Fletcher's money was planned. At the meeting to which Mae Liza Lee testified, there was a mention of a gun. He knew the plan involved taking Fletcher to a canal. When asked whether he would participate in the plan, defendant stated, "I don't want no part of it. I don't want no money, but I'll be there." Although the statement is ambiguous, it is clear that defendant did not want to withdraw from the group. Rather, he wanted to be present. He never demonstrated any opposition to the group's planned actions. Although he claims to have stated that he did not want a share of the money, Mae Liza Lee awakened to see him with money in his hands. At no time did he attempt to warn the proper law enforcement authorities, or otherwise attempt to prevent the execution of the group's plan. At no time did he attempt to assist the victim directly nor attempt to warn the victim of the group's planned actions, even though he was with the victim shortly before the plan was executed. According to his own testimony, he watched Ollie Lee and James Wilkerson beating Fletcher for approximately 10 to 20 minutes while standing 15 feet away. Only then, according to his own testimony, but not according to his prior statement, did he try to stop the beating. Under all these circumstances, it was reasonable for the trial court, as the trier of fact, to conclude that defendant subscribed to an unlawful venture which fostered a mood of violence and, as a natural consequence, resulted in the death of Theodore Fletcher. He was, therefore, guilty of armed robbery and murder on a theory of accountability.

■■ Defendant stresses that he lacked the intent to commit murder at the time of the beating. In *People v. Kessler*, 57 Ill. 2d 493, 315 N.E.2d 29, *cert. denied*, 419 U.S. 1054, 42 L. Ed. 2d 650, 95 S. Ct. 635, however, the court rejected the contention that a specific intent to commit or to aid the commission of all the substantive crimes for which a defendant is to be held accountable must be proved. Interpreting the meaning of the accountability provision in the Criminal Code, the court declared that a defendant's accountability extends to any criminal act done in furtherance of the planned and intended act. In the instant case, the murder of Theodore Fletcher was an act done in furtherance of the planned and intended act of robbing him.

■■ Defendant's final contention is that his conviction for armed robbery must be reversed because both the armed robbery and the

murder of Theodore Fletcher arose from the same act. In support of his contention, defendant relies upon *People v. Lilly*, 56 Ill. 2d 493, 309 N.E.2d 1, which involved convictions of rape and indecent liberties with a minor emanating from the same act. The court held that since both charges arose from a single act of intercourse, the lesser offense merged in the greater, and the conviction for indecent liberties was hence invalid. Analogously, defendant urges that the charge of murder and the charge of armed robbery in the instant case arose from a single act, the beating of Theodore Fletcher, the lesser offense merged in the greater, and the conviction for armed robbery was hence invalid.

While the decision in *Lilly* prohibits convictions for more than one offense emanating from the same act, more recent Illinois Supreme Court decisions have qualified this prohibition. In *People v. Green*, 62 Ill. 2d 146, 340 N.E.2d 9, the court held that the defendant's convictions and concurrent sentences for attempt robbery and murder were valid. In support of its decision, the court relied on *People v. Johnson*, 44 Ill. 2d 463, 256 N.E.2d 343, *cert. denied*, 400 U.S. 958, 27 L. Ed. 2d 266, 91 S. Ct. 356. In *Johnson*, the court upheld convictions and sentences for burglary and rape, declaring that the prohibition against prosecution for multiple offenses emanating from the same act was not intended to cover situations in which more than one offense arises from a series of closely related acts and the crimes are clearly distinct and require different elements of proof. In the instant case, the beating and the subsequent robbery of Theodore Fletcher were closely related acts giving rise to more than one offense, and the crimes emanating from those acts, murder and armed robbery, were clearly distinct and required different elements of proof. In a case more factually analogous to the instant case, *People v. McDonald*, 15 Ill. App. 3d 620, 305 N.E.2d 69, the court concluded that the conduct by which the defendant and another person shot and killed the victim was separable and independently motivated from the conduct by which they robbed him of his wallet and his money seconds later. While the court did not elaborate on its conclusion, it implied that the shooting constituted one separately motivated act and the robbery of the victim another. In the instant case, the beating of Theodore Fletcher may be considered one separately motivated act and the subsequent robbery another. On the basis of *Green, Johnson*, and *McDonald*, we conclude that the armed robbery and murder of Theodore Fletcher for which defendant was convicted on an accountability theory did not arise from the same act and that the armed robbery conviction should therefore be affirmed.

■■ Pursuant to Illinois Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1975, ch. 110A, par. 615(b)(4)), a reviewing court may reduce the punishment imposed by the trial court. After reviewing the record, we conclude that the sentences imposed by the trial court in the instant case

were excessive. Accordingly, we reverse the trial court's sentencing determinations, and remand the cause to the trial court with directions that sentences of 14 to 20 years be imposed, the sentences to run concurrently.

For the foregoing reasons, the judgment of the trial court is affirmed in part, reversed in part, and remanded with directions that the trial court reduce the sentences imposed on defendant.

Affirmed in part, reversed in part and remanded with directions.

DRUCKER and BARRETT, JJ., concur.