(No. 36799.—▇▇▇▇▇▇▇▇)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HENRY HUGHES *et al.,* Plaintiffs in Error.

*Opinion filed Sept. 28, 1962.—Rehearing denied Nov. 29, 1962.*

EUCLID LOUIS TAYLOR and HOWARD T. SAVAGE, both of Chicago, for plaintiffs in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and JOHN T. GALLAGHER and MATTHEW J. MORAN, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

At a bench trial in the criminal court of Cook County, Henry Hughes and Samuel Jenkins, hereinafter referred to

as the defendants, were jointly convicted with four other youths of murdering one Malcolm Williams and were subsequently sentenced to the penitentiary for a term of twenty years. Upon writ of error defendants contend that a reasonable doubt exists as to their guilt and that certain oral and written statements made by the alleged participants should not have been admitted into evidence.

The record indicates that about 9:00 P.M. on May 2, 1960, Hughes and Jenkins, fifteen and sixteen years old, respectively, met Ernest Wrenn, Walter McLemore, Joseph Lewis and Walter Weatherall, all teen-agers and all members of a group calling themselves the "Vice Lords," at the corner of 14th Street and Springfield Avenue in Chicago. The group decided to walk to the intersection of 16th Street and Christiana Avenue to find another group of boys known as the "Imperial Chaplains," with whom they had had some difficulty. Either Hughes or Wrenn was carrying a sawed-off rifle at the time and while enroute they saw Malcolm Williams and his brother-in-law, William Maddox, drinking in an alley. Although the evidence as to what then transpired is somewhat conflicting, it is apparent that three shots were fired from the sawed-off rifle as the two men attempted to flee, one of such shots mortally wounding Williams in the back and another entering Maddox's pant leg. Later the same day, the gun was found by the police in the possession of Joseph Lewis.

At the trial Maddox testified that he and Williams were accosted in the alley by a gang of fellows who demanded the package they were carrying and the contents of their pockets, and that one of the boys produced what the witness then thought was a piece of pipe. The men turned and fled in the opposite direction down the alley and, as they did so, three or four shots were fired. Upon returning to the alley a few minutes later, Maddox found Williams lying dead upon the ground with a bullet hole in the back near the left shoulder blade. Maddox admitted he had been drinking at

the time and he could not identify the boys who engaged in the attack.

Joseph Patt, a Chicago police officer told of certain conversations he had with Hughes, Jenkins, McLemore, and Lewis on May 5th and 6th, 1960. According to this witness, Hughes admitted having met the other boys on the evening in question and having examined a sawed-off rifle which one of the group brought along. Thereupon the youths decided to walk over and "meet the Imperial Chaplains" but while enroute they saw two or three men in an alley. Jenkins asked the men for a drink but was cursed and told he was too young, whereupon Hughes raised the gun and the men started to run in the opposite direction. Just then, related Hughes, he shot at a dog running down the alley in the same direction and observed one of the men make a funny lurch. McLemore then took the gun from Hughes and fired another shot down the alley in the direction the men had been running. Wrenn then grabbed the rifle after which the group continued to their meeting with the Imperial Chaplains to discuss difficulties that had previously occurred. The police officer also testified that Jenkins admitted having seen and handled the gun while with the group at the corner of 14th Street and Springfield Avenue.

Over defendants' objection, the court admitted into evidence a written statement signed by Hughes, Jenkins, McLemore and Lewis on May 6, 1960, wherein they described the occurrences of May 2nd. As stated therein, the group assembled at about 9:00 P.M. and decided to walk to the corner of 16th and Christiana, where the Imperial Chaplains usually gathered, to discuss with them the beating given one of the defendants' group, the Vice Lords, by the Chaplains the day before. Wrenn brought the gun along just in case they were "jumped" or out-numbered by the Imperial Chaplains. As they were walking towards 16th Street, they noticed three men in an alley drinking from a bottle and Jenkins asked for a drink. The men cussed at him and told

him he was too young to drink, whereupon Hughes took the rifle from Wrenn and shot at a dog which was running down the alley. The men either at that time or prior to the first shot, turned and started running in the same direction as the dog after which both McLemore and then Wrenn fired the rifle down the alley. Since it was quite dark, the boys did not observe what happened to the men except that one of them did jerk or turn after the first shot. The youths then continued on their way to 16th Street and Christiana where Wrenn talked with one of the Imperials about the prior beating. As he did so, other members of the Imperial gang ran to the opposite side of the street. Thereafter, defendants' group disbanded and ultimately the boys went home.

A second written statement, signed by Hughes, Lewis, Weatherall and Wrenn on June 10, 1960, was admitted into evidence after defendants' motion to suppress because of alleged involuntariness was denied upon preliminary hearing. In this statement it was admitted that defendants' group all examined the rifle while at the corner of 14th and Springfield Avenue and then went "looking for the Imperial Gang." As they passed an alley some of the group entered and three shots were fired. One of the boys stated: "We shot down the alley we thought it was the Imperials."

In his own behalf Henry Hughes testified at the trial that the group had left the corner of 14th and Springfield Avenue about 8:30 P.M. on May 2, 1960, to talk with a sponsor about baseball uniforms and the scheduling of a baseball game, and were walking towards 16th Street and Christiana Avenue when they saw three men in an alley drinking wine. The men started to walk away as the boys entered the alley and just then a dog appeared. Hughes fired at the dog and was about to shoot again when Mc-Lemore grabbed the gun, discharging it. Wrenn then reloaded the gun and fired a third time. Thereafter, the

group continued to meet with the sponsor as originally planned. Hughes denied that Jenkins or any member of the group spoke with the men in the alley or that the youths had any intention of harming them or the Imperial Chaplains. He did admit, however, that the gun's hiding place was known to most of the group and that he had in fact brought it to their meeting place on the evening in question.

Samuel Jenkins also testified they had set out sometime after 8:00 P.M. on May 2 to discuss a baseball game with their sponsor and that, as they passed an alley in which three men were standing, a dog ran from from behind some garbage cans. Hughes fired in the ground towards the dog and as McLemore attempted to take the gun it discharged again. He denied talking with the men in the alley or having any ill feelings towards the Imperial Chaplains. McLemore testified that as he and Hughes entered the alley, three men were standing some fifty feet away drinking from a bottle. When Hughes raised the gun to shoot at a dog, according to this witness, the men ran in the same direction and after the first shot one of the men made an unnatural jerk or motion. Similar accounts were rendered at the trial by Joseph Lewis, Ernest Wrenn and Walter Weatherall.

The killing of a human being, even though involuntary, constitutes the crime of murder if it occurs during the commission of an unlawful act which in its consequences naturally tends to destroy human life, or is committed in the prosecution of a felonious intent. (Ill. Rev. Stat. 1959, chap. 38, par. 363.) Where one attaches himself to a group bent on illegal acts which are dangerous or homicidal in character, or which will probably or necessarily require the use of force and violence that could result in the taking of life unlawfully, he becomes criminally liable for any wrongdoings committed by other members of the group in furtherance of the common purpose, or as a natural or probable consequence thereof, even though he did not actively par-

ticipate in the overt act itself. (*People* v. *Rybka,* 16 Ill.2d 394; *People* v. *Hobbs,* 400 Ill. 143; *People* v. *Pierce,* 387 Ill. 608; 14 I.L.P., Criminal Law, sec. 75, p. 514.) Here there was considerable evidence to show defendants and their friends belonged to a group called the Vice Lords, a member of which had been beaten the previous night by a rival gang, the Imperial Chaplains. A sawed-off rifle, which had been hidden in a place known to most of the participants, was removed by Hughes and brought to the street corner where it was seen and examined by all the youths prior to leaving to settle their differences with the Imperials. The gun was brought along to assist them in their venture. While enroute they encountered Williams and Maddox in an alley, and either by design or reckless indifference, the former was shot and the latter's pant leg was creased by a bullet. Shortly thereafter the youths continued to the corner of 16th Street and Christiana, where the Imperial Chaplains usually gathered, and talked with a member of the rival gang. It is of little consequence whether the shooting of Williams and the near-miss of Maddox resulted from random shooting evidencing a reckless disregard for human life or whether, as the shooting accuracy might indicate, the victims were mistaken for members of the rival gang. In either event, the proof indicates that when they left 14th Street, each of the participants knew of the unlawful purpose which was intended and of the presence of a dangerous weapon. Having thus embarked upon a course of action which was dangerous in character and could reasonably be expected to require the use of force that might result in the death of a human being, a mood of violence was thereby created which rendered each passer-by a potential victim and each participant a potential murderer.

This case is not unlike *People* v. *Rybka,* 16 Ill.2d 394, wherein a group of boys armed with a hammer set out to "get" a negro. Although the fatal blow was struck by a

single individual, all seven members of the group were convicted of murder. In *People* v. *Rudecki,* 309 Ill. 125, where a shooting occurred when members of a particular club called at the rooms of another organization for the ostensible purpose of starting a fight, the entire visiting group was adjudged equally guilty, and in *People* v. *Marshall,* 398 Ill. 256, the same determination was made even though the victim was a member of the participants' own group who had been mistaken in the dark for a rival during a gang war. Although it was not conclusively established that Hughes fired the fatal shot or that Jenkins attempted to rob the victims immediately prior thereto, we believe it was proved beyond a reasonable doubt that they had subscribed to an unlawful venture which, as a natural consequence, resulted in the death of Malcolm Williams. They were, therefore, each guilty of murder.

We must next consider defendants' claim that certain oral and written statements made by the alleged participants should not have been admitted into evidence. At the preliminary hearing upon the motion to suppress the written statement signed by Hughes, Lewis, Weatherall and Wrenn on June 10, 1960, the former testified that he signed the statement only after being threatened by a police officer and without knowing its contents. When asked why he had signed it, Hughes answered because he thought the statements therein were true. Weatherall claimed he was threatened with a knife and promised his release if he would sign the instrument, but he admitted most of the statements therein were true and that it had been read to Wrenn, Hughes and Lewis before they affixed their signatures. In his testimony, Wrenn asserted that he had been subjected to physical brutality prior to signing, but Joseph Lewis, although claiming he did not read the statement, admitted he was neither struck nor threatened by the police. Joseph Patt and Emmons Russell, two of the investigating officers,

denied there were any threats or brutality but stated that the youths signed the statement after having fully read and been advised of its contents.

At time of trial, Hughes testified he was scared and sleepy when the verbal admissions were made to the police on May 5, 1960, and that the written statement of May 6 was not read to him before signing. Jenkins also asserted he did not know the contents of the May 6 written statement when he signed. Similar claims were made by Mc-Lemore and Lewis.

The voluntary character of the written statements of May 6 and June 10 having been put in issue, it was incumbent upon the trial court to hear the witnesses and determine the facts in this particular. That the trial judge did not believe the defendants' account is amply demonstrated by his remarks prior to sentencing, in which he stated that he was not impressed with the demeanor of the defendants and did not believe their changed versions which they gave at time of trial. To the contrary, he believed the prior statements were voluntarily made and set forth the actual facts of the crime. The presiding judge was in a much better position to determine this matter than is a court of review and we find nothing in this record which compels us to disturb his rulings which admitted the statements into evidence. It should also be noted that no objection was made to the verbal admissions related by officer Patt, which contained essentially the same information as the written statement of May 6, thus defendants are in no position to raise the point at this time. *People v. Pierce,* 387 Ill. 608.

Finding no error, the judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*