(No. 37147.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ERNEST WRENN, Plaintiff in Error.

*Opinion filed Nov. 26, 1963.—Rehearing denied Jan. 20, 1964.*

BERLE L. SCHWARTZ, of Highland Park, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and ELMER C. KISSANE and JAMES R. THOMPSON, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SOLFISBURG delivered the opinion of the court:

Defendant, Ernest Wrenn, was indicted jointly with five co-defendants in the criminal court of Cook County for the murder of Malcolm Ira Williams. They were tried by the court, found guilty of murder, and were all sentenced to the State penitentiary for twenty years. Defendant Wrenn prosecutes this writ of error from his conviction.

It is defendant's contention that there was insufficient evidence to prove that he either personally caused the death of the decedent, or was a member of the company engaged in an unlawful act, the accomplishment of which necessarily or probably required the use of force or violence or would

result in serious bodily harm to or the death of a human being.

The deceased, Williams, died as a result of a shot fired from a sawed-off rifle by one of a group of six boys including the defendant the night of May 2, 1960. We have previously reviewed the evidence in this case in *People* v. *Hughes,* 26 Ill.2d 114, where we upheld the conviction of Hughes and Samuel Jenkins, two of Wrenn's co-defendants. In the *Hughes* case we stated at pages 116 and 117:

"The record indicates that about 9:00 P.M. on May 2, 1960, Hughes and Jenkins, fifteen and sixteen years old, respectively, met Ernest Wrenn, Walter McLemore, Joseph Lewis and Walter Weatherall, all teen-agers and all members of a group calling themselves the 'Vice Lords,' at the corner of 14th Street and Springfield Avenue in Chicago. The group decided to walk to the intersection of 16th Street and Christiana Avenue to find another group of boys known as the 'Imperial Chaplains,' with whom they had had some difficulty. Either Hughes or Wrenn was carrying a sawed-off rifle at the time and while enroute they saw Malcolm Williams and his brother-in-law, William Maddox, drinking in an alley. Although the evidence as to what then transpired is somewhat conflicting, it is apparent that three shots were fired from the sawed-off rifle as the two men attempted to flee, one of such shots mortally wounding Williams in the back and another entering Maddox's pant leg. Later the same day, the gun was found by the police in the possession of Joseph Lewis.

"At the trial Maddox testified that he and Williams were accosted in the alley by a gang of fellows who demanded the package they were carrying and the contents of their pockets, and that one of the boys produced what the witness then thought was a piece of pipe. The men turned and fled in the opposite direction down the alley and, as they did so, three or four shots were fired. Upon returning to the alley a few minutes later, Maddox found Williams lying dead

upon the ground with a bullet hole in the back near the left shoulder blade. Maddox admitted he had been drinking at the time and he could not identify the boys who engaged in the attack."

Wrenn admitted that he fired the third shot in the alley. However, it would appear that Maddox and the deceased had fled the alley by the time the third shot was fired. The evidence in the record would indicate that Hughes and Mc-Lemore fired the first two shots.

Wrenn signed a written statement, which was admitted into evidence, wherein it was admitted that the entire group examined the rifle at the corner of 14th and Springfield Avenue and then went "looking for the Imperial Gang." As they passed an alley some of the group entered and three shots were fired. One of the boys stated: "We shot down the alley we thought it was the Imperials."

From the evidence in the record, which is more fully set forth in the *Hughes* case, we think it clear that Wrenn, like Hughes and Jenkins, subscribed to the same unlawful venture which, as a natural consequence, resulted in the death of Malcolm Williams. In coming to this conclusion we have not considered written or oral statements made out of the presence of Wrenn and which were not admitted into evidence against him.

We feel that our language in *People* v. *Hughes,* 26 Ill.2d 114, is equally applicable to Wrenn. We stated at pages 119 to 121:

"The killing of a human being, even though involuntary, constitutes the crime of murder if it occurs during the commission of an unlawful act which in its consequences naturally tends to destroy human life, or is committed in the prosecution of a felonious intent. (Ill. Rev. Stat. 1959, chap. 38, par. 363.) Where one attaches himself to a group bent on illegal acts which are dangerous or homicidal in character, or which will probably or necessarily require the use of force and violence that could result in the taking of

life unlawfully, he becomes criminally liable for any wrong-doings committed by other members of the group in further-ance of the common purpose, or as a natural or probable consequence thereof, even though he did not actively par-ticipate in the overt act itself. (*People* v. *Rybka*, 16 Ill.2d 394; *People* v. *Hobbs*, 400 Ill. 143; *People* v. *Pierce*, 387 Ill. 608; 14 I.L.P., Criminal Law, sec. 75, p. 514.) Here there was considerable evidence to show defendants and their friends belonged to a group called the Vice Lords, a member of which had been beaten the previous night by a rival gang, the Imperial Chaplains. A sawed-off rifle, which had been hidden in a place known to most of the partici-pants, was removed by Hughes and brought to the street corner where it was seen and examined by all the youths prior to leaving to settle their differences with the Imperials. The gun was brought along to assist them in their venture. While enroute they encountered Williams and Maddox in an alley, and either by design or reckless indifference, the former was shot and the latter's pant leg was creased by a bullet. Shortly thereafter the youths continued to the corner of 16th Street and Christiana, where the Imperial Chaplains usually gathered, and talked with a member of the rival gang. It is of little consequence whether the shooting of Williams and the near-miss of Maddox resulted from ran-dom shooting evidencing a reckless disregard for human life or whether, as the shooting accuracy might indicate, the victims were mistaken for members of the rival gang. In either event, the proof indicates that when they left 14th Street, each of the participants knew of the unlawful pur-pose which was intended and of the presence of a dangerous weapon. Having thus embarked upon a course of action which was dangerous in character and could reasonably be expected to require the use of force that might result in the death of a human being, a mood of violence was thereby created which rendered each passer-by a potential victim and each participant a potential murderer.

"This case is not unlike *People* v. *Rybka*, 16 Ill.2d 394, wherein a group of boys armed with a hammer set out to 'get' a negro. Although the fatal blow was struck by a single individual, all seven members of the group were convicted of murder. In *People* v. *Rudecki*, 309 Ill. 125, where a shooting occurred when members of a particular club called at the rooms of another organization for the ostensible purpose of starting a fight, the entire visiting group was adjudged equally guilty, and in *People* v. *Marshall*, 398 Ill. 256, the same determination was made even though the victim was a member of the participants' own group who had been mistaken in the dark for a rival during a gang war. Although it was not conclusively established that Hughes fired the fatal shot or that Jenkins attempted to rob the victims immediately prior thereto, we believe it was proved beyond a reasonable doubt that they had subscribed to an unlawful venture which, as a natural consequence, resulted in the death of Malcolm Williams. They were, therefore, each guilty of murder."

Defendant seeks to distinguish the *Hughes* case on the ground that Hughes carried the weapon and fired the first shot in the direction of the decedent, while it does not appear that Wrenn fired a shot until the deceased had fled from the alley. Defendant further argues that insofar as the Hughes conviction was sustained on the basis of his participation in an unlawful venture that opinion is incorrect. With these arguments we cannot agree. The evidence properly admissible against Wrenn shows that he, like Hughes and Jenkins, was a willing member of a group that obtained a deadly weapon and went off to seek their rivals to discuss prior fights. The presence of the rifle belies the peaceful intentions claimed by the participants. We think that the death of Williams was a natural consequence of the unlawful venture entered into by defendant Wrenn and that he was guilty of murder.

Defendant insists that such a conclusion is contrary to

*People* v. *Basile,* 356 Ill. 171 ; *People* v. *Faught,* 343 Ill. 312, and *People* v. *Meisner,* 311 Ill. 40. In the *Basile* case the court reversed and remanded homicide convictions based upon involuntary confessions, and pointed out that the only connection between one of the defendants and the homicide was that he was a party to a plan to hold up a dress shop, but that there was no evidence that the shooting outside his presence was in any way connected with a planned hold-up. In *Faught* the court reversed a murder conviction on the basis of an erroneous instruction that was inapplicable to the facts of the case. In *Meisner* there was no evidence connecting one defendant with the crime in question. We think all of these decisions are factually inapposite.

We hold that our conclusions in *People* v. *Hughes,* 26 Ill.2d 114, are controlling here, and the judgment of the trial court is affirmed.

*Judgment affirmed.*