THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LONELL MOSLEY, Defendant-Appellant.

First District (4th Division)    No. 78-1192

Opinion filed June 12, 1980.

Ralph Ruebner and Rafael Schwimmer, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and James L. Alexander, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, Lonell Mosley, was found guilty of one count of murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1), two counts of attempt murder (Ill. Rev. Stat. 1973, ch. 38, par. 8—4(a)), and one count of aggravated battery (Ill. Rev. Stat. 1973, ch. 38, par. 12—4). Defendant was sentenced to

concurrent prison terms of 50 to 100 years for murder, 10 to 20 years for one count of attempt murder and 10 to 30 years for the other count of attempt murder.

On appeal defendant contends reversible error occurred when: (1) the trial court instructed the jury that defendant could be found guilty of attempt murder if he had the intent to murder or do great bodily harm; and (2) the trial court abused its discretion by imposing an excessive sentence of 50 to 100 years for murder.

We affirm.

While no issue is raised as to the sufficiency of the evidence to establish guilt beyond a reasonable doubt, we find it necessary to briefly summarize the evidence.

The evidence at trial discloses that on May 19, 1974, William Templin, a 26-year-old security trainee for the Penn Central Railroad, was shot to death while searching for goods which were missing from a railroad car. Templin, who was dressed in civilian clothes and armed with only a flashlight, and his partner, Joseph Gill, who was dressed in uniform and armed with a gun, had separated to facilitate the search. When Templin did not return Gill's radio calls, Gill notified headquarters and began looking for Templin.

As Gill walked down the railroad embankment, he saw a hole in a fence which separates the railroad tracks from the Chicago Skyway. After walking further, he saw the shape of two heads among the weeds. As Gill shouted "halt," two shots were fired. Gill returned fire, emptying his gun. When he retreated to his squad car, two more shots were fired at him.

After additional police officers arrived, Gill led them along the embankment. Gill found Templin lying face down in the weeds. Templin had been shot in the back of the head and was dead.

At trial, police officer Daniel Hammond testified that he and his partner were sitting in their squad car near 69th Street and Calumet Avenue when they heard a series of gun shots. They proceeded toward the Chicago Skyway and approximately two minutes later, as they drove on Anthony Street which runs parallel to the Skyway, they saw three black men dressed in dark clothing heading through a gangway near 70th Street.

As the police officers proceeded to drive through the alley behind Anthony Street, Hammond again saw the three men. Two of the men climbed over a fence, and the third, who held a rifle in his hand, was in the process of jumping over the fence. As the police officers exited from the car, Hammond shouted, "Halt, police officer." Drawing his revolver, Hammond then jumped over the fence and landed in a courtyard adjacent to several buildings.

When Hammond was 10 feet from the fence, he saw a human

silhouette move on a stairwell under the center porch of the nearby building. Hammond then saw a flash of light and heard a gunshot. As he felt his arm become limp, he dropped his revolver. Hammond ran back and jumped over the fence. As his partner crossed the gangway to assist him, more shots were fired.

Police officers Ford and Irving arrived in a squad car. After they directed the squad car spotlight in the gangway and left the car, they saw a man, later identified as David Beverly, jump to the ground from the second story porch of one of the nearby buildings. They chased the man as he ran to Eberhart Street and subsequently apprehended him. Police sergeant John Burge testified he searched the second story porch where Beverly first was seen and he recovered an M-1 carbine rifle, ammunition, and clothing including a black military fatigue jacket.

While Ford and Irving were chasing Beverly, police officers Mitchell and Jones joined Hammond. Mitchell and Irving jumped over the fence and into the courtyard. Mitchell saw defendant standing in a stairwell. After Mitchell shouted to the defendant to halt, defendant dropped the .30 caliber M-1 carbine rifle he was holding.

From the stairwell, the officers recovered the rifle and an ammunition clip. Subsequently, defendant's fingerprint was taken from this clip. The police also recovered a revolver which was later identified as Hammond's gun. Police sergeant Hose Crossley, who also assisted in the arrest, testified that when defendant was apprehended he was wearing a black shirt jacket, black jungle fatigues, and black boots.

A few blocks away, the third accomplice, a man called Alto, who was dressed in clothing similar to defendant's and Beverly's clothing, was shot to death by the return gunfire of police officer Word. Alto had been shooting a .30-caliber M-1 rifle at Word.

Police officer Jalal Ally testified that he searched the railroad embankment where Templin was found. Near a hole in a fence which runs along the embankment, he found two duffle bags and a suitcase. One bag contained a gun-cleaning kit, several gas masks, a length of rope tied in a noose, and a loaded revolver. The bag also contained 18 rounds of .38 caliber bullets and 1,425 rounds of .30 caliber bullets.

The suitcase contained a loaded revolver and mimeographed papers which threatened racial war and death to law enforcement officers. In addition, both Mosley's and Beverly's wallets containing identification were found in the suitcase. The next day, Officer Burge searched the embankment and recovered six shell casings which he later identified as .30-caliber ammunition.

Police officer Robert Minstre, an evidence technician, testified to the appearance of Templin's body when he examined it. He determined the

bullet went through Templin's head and into the embankment. After sifting through the dirt underneath Templin's head, he found a .30-caliber jacketed bullet which had been fired. Police officer Donald Smith, a firearms examiner, performed tests on the three recovered rifles and determined that the bullet recovered from the embankment had come from the rifle found on the second story porch of the building where Beverly had been seen.

Defendant testified that prior to the shooting, he and Beverly had marched in a parade commemorating Reverend Martin Luther King's birthday. Beverly asked defendant to join him and Alto for a trip to the southern part of the country. Defendant refused, but agreed to help them carry their belongings.

Defendant helped Beverly carry a suitcase which weighed approximately 200 pounds. As they walked toward the Chicago Skyway, Alto and Beverly each carried a duffle bag. When they arrived at the Skyway, Beverly told defendant to wait near the viaduct. Beverly and Alto carried their duffle bags and walked into the bushes. They returned, again told defendant to wait, and left with the suitcase.

Approximately 15 to 20 minutes later, defendant heard shooting. Defendant testified he ran away, entered an alley, and jumped over a fence. He heard more shots and hid in a stairwell. He then observed two individuals climb over the fence. Defendant stated that he did not have a weapon and he did not shoot anyone. He also asserted he had not touched the rifle found in the stairwell where he was hiding.

The State then sought to impeach defendant's trial testimony with defendant's preliminary hearing testimony. At the preliminary hearing, defendant testified he walked with Beverly down the railroad embankment and they saw a man with a flashlight. After Beverly grabbed the man, they remained in the track area for five minutes.

After closing arguments, the trial court gave the jury an attempt murder instruction. The record discloses defendant raised no objection to the form or contents of the attempt murder instruction nor did defendant raise, in his post-trial motion for a new trial, an issue as to the attempt murder instruction. The instruction given to the jury read as follows:

> "You are further instructed a person commits a crime of attempt murder who with the intent to commit the crime of murder, does any act which constitutes a substantial step toward the commission of a crime of murder and the person intends to kill or do great bodily harm to that individual or he knows such act will cause great bodily harm to that individual.
>
> You are further instructed that to sustain a charge of attempt murder, the State must prove the following propositions:

First that the Defendant or one for whose conduct he is responsible performed an act which constituted a substantial step toward the commission of a crime of murder of [Gill and Hammond] and

Second, that the Defendant or one's conduct he is responsible for, did so with the intent to commit the crime of murder;

And Third, that the Defendant or one whose conduct he is responsible for, intended to kill or do great bodily harm to Joseph Gill or that the Defendant or one whose conduct he is responsible, knew such act would cause death of [Gill and Hammond]."

The instruction defining murder described three mental states: intent to kill; intent to do great bodily harm; and knowledge that the acts performed would cause death or a strong probability of death or great bodily harm. After the jury found defendant guilty as charged, the court imposed concurrent sentences of a 50- to 100-year prison term for murder, a 10- to 20-year term for attempt murder of Gill and a 10- to 30-year term for attempt murder of Hammond.

OPINION

I

Defendant first contends reversible error occurred when the trial court gave the attempt murder instruction, since it permitted the jury to find defendant guilty of attempt murder without finding that defendant had the specific intent to kill. The State contends that defendant waived this error for purposes of appeal since he failed to object to the instruction at trial and he failed to include this alleged error in his post-trial motion for a new trial. We agree.

Although "[a]n instruction must make it clear that to convict for attempted murder nothing less than a criminal intent to kill must be shown" (*People v. Harris* (1978), 72 Ill. 2d 16, 27, 377 N.E.2d 28, 33), failure to object to the lack of such an instruction at trial constitutes waiver of the error on appeal unless the error is substantial or the interests of justice require reversal. *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331; *People v. Underwood* (1978), 72 Ill. 2d 124, 378 N.E.2d 513.

In *Roberts*, our supreme court discussed the limited exception to the waiver rule in the context of a failure to object to an erroneous attempt murder instruction similar to the instruction here. Although the instruction was objectionable, the court held:

"[W]here there is a failure to object to an instruction, waiver is the rule, and the provision of our Rule 451(c) constitutes an exception which, under the prior decisions of this court, is a limited exception (*People v. Underwood* (1978), 72 Ill. 2d 124, 129-30), to be

used to correct 'grave errors' (*People v. Jenkins* (1977), 69 Ill. 2d 61, 66), or to be applied where the case is close factually and fundamental fairness requires that the jury be properly instructed (*People v. Joyner* (1972), 50 Ill. 2d 302, 307)." (75 Ill. 2d 1, 14, 387 N.E.2d 331, 337.)

The *Roberts* court affirmed the conviction, concluding that the case was not close factually and the error did not deprive the defendant of a fair trial. See also *People v. Stacker* (1979), 77 Ill. App. 3d 302, 395 N.E.2d 997; *People v. Sprinkle* (1979), 74 Ill. App. 3d 456, 393 N.E.2d 94.

The evidence presented here clearly establishes defendant's intent to kill both Hammond and Gill, and we therefore do not believe this case is "close factually." Hammond testified that after he observed a human silhouette in a stairwell, he saw a flash of light and heard a gun fire. He dropped his gun as he felt his arm become limp, and realized he was wounded. When Officer Mitchell apprehended defendant in the stairwell, defendant was holding a rifle. Hammond's gun and ammunition for the rifle also were found in the stairwell. This testimony indicates that defendant intended to kill Hammond. Further, Hammond had announced his office and defendant fired at Hammond from a distance of 12 feet to 15 feet. The fact that defendant fired a gun at Hammond from this distance supports the conclusion that defendant acted with intent to kill. *People v. Lewis* (1979), 75 Ill. App. 3d 259, 393 N.E.2d 1098; *People v. Seats* (1979), 68 Ill. App. 3d 889, 386 N.E.2d 879. See also *People v. Humes* (1979), 78 Ill. App. 3d 255, 397 N.E.2d 130.

The evidence presented also amply supports the conclusion that defendant acted with intent to kill Gill. Gill testified he saw the heads of two persons hiding in the weeds. After he shouted "Halt," two shots were fired at him. When he retreated to his squad car, two more shots were fired at him. Although at trial defendant asserted he was not with Beverly on the railroad embankment when the shots were fired, at the preliminary hearing he testified he walked with Beverly on the embankment and remained in the area five minutes after Beverly grabbed a man with a flashlight.

It is clear that a defendant is criminally liable for any wrongdoings committed by other members of the group in furtherance of a common purpose. (*People v. Hughes* (1962), 26 Ill. 2d 114, 185 N.E.2d 834.) The fact that Beverly rather than defendant may have fired the gun at Gill does not reduce the accountability of defendant nor does it make the case "close factually," so that if the alleged error had not been committed by the trial court, the jury would have returned a not guilty verdict.

■■ Since we conclude that the evidence of defendant's attempt murder of Gill and Hammond did not present a "factually close" case, we hold

that defendant's failure to object to the attempt murder instruction was a waiver of the error for purposes of this appeal. Accordingly, we affirm defendant's attempt murder convictions.

## II

Defendant next contends that the trial court committed error when it imposed a prison term of 50 to 100 years upon him. Defendant asserts the sentence is excessive and the trial court failed to consider various mitigating factors. We disagree.

■■ The imposition of a sentence is within the sound discretion of the trial court and, absent an abuse of that discretion, a court of review has no authority to modify the sentence. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Masini* (1978), 65 Ill. App. 3d 1011, 383 N.E.2d 1, *aff'd* (1979), 78 Ill. 2d 17, 397 N.E.2d 1368.

Defendant argues that since the weapon used to murder Templin was linked to Beverly and Beverly was sentenced to a 10- to 30-year prison term for the attempt murder of Hammond, we should reduce defendant's sentence to a 15- to 25-year prison term because defendant was held accountable for Beverly's act and defendant's participation in the offense was less active.

Defendant's argument assumes that Beverly was the more culpable defendant. This assumption is without merit since defendant was convicted of murder, two counts of attempt murder, and aggravated battery, while in a separate trial Beverly was found guilty of one count of attempt murder and one count of aggravated battery. (*People v. Beverly* (1978), 63 Ill. App. 3d 186, 379 N.E.2d 753.) Although at trial there was evidence linking Beverly to the weapon used to kill Templin, we agree with the State that there also was sufficient evidence for the jury to conclude that defendant had fired the shot that killed Templin and, when the offenders attempted to flee, the weapons were inadvertently exchanged and Beverly was left with the murder weapon.

Defendant also argues the trial court failed to consider that he was 22 years old at the time of the offense, that he had no prior felony record, that he came from a broken home, and that he has potential for rehabilitation. The record discloses that the trial court considered these factors but concluded that the seriousness of the offense outweighed these mitigating matters.

Particularly, the court considered the evidence that clearly disclosed that all three offenders acted in concert to senselessly execute Templin. The court took note that Templin had been shot in the back of the head and that defendant was apprehended while he was holding a rifle in his hands. The police also had recovered an extensive amount of high-powered ammunition and mimeographed material bearing threats of death to people engaged in law enforcement.

In the trial court's opinion, the crimes were brutal and especially senseless; we cannot say that the trial court, who heard the evidence presented, reached an erroneous conclusion. We find, therefore, that the trial court did not abuse its discretion by imposing concurrent sentences of prison terms of 50 to 100 years for the murder of Templin, 10 to 20 years for attempt murder of Gill, and 10 to 30 years for attempt murder of Hammond.

Accordingly, for the reasons stated, we affirm the defendant's convictions.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.