The People of the State of Illinois, Plaintiff-Appellee, *v.* Loring Britt *et al.*, Defendants-Appellants.

(No. 59594; )

First District (1st Division)—September 16, 1974.

Paul Bradley and Edwin R. McCullough, both of State Appellate Defender's Office, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (James S. Veldman and Roger Horwitz, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE EGAN delivered the opinion of the court:

A jury found Loring Britt and Charles Caples guilty of three counts of aggravated battery causing great bodily harm, three counts of aggravated battery using a deadly weapon and three counts of armed robbery. The trial court sentenced each defendant to three concurrent terms of not less than 7 nor more than 10 years on each of the three counts of armed robbery. The defendants assign several grounds for a new trial but do not question the sufficiency of the evidence.

On August 24, 1969, Ted Nicholas, the owner of the Rivers Edge Restaurant at 325 North Wells Street in Chicago, left the restaurant between 1 and 2 A.M. with Nick Franco, John Scuris, Edmon DeFiore, Steve Kutis and Terry Kutis. He went with Franco and Scuris to get his car which was parked at the receiving dock at the northeast corner of the building. The other three went to get their car which was parked on Wells Street. After he got in the car, he heard a voice say, "Put your hands up, get out of the car." When he looked up, he saw a man he later identified as Loring Britt standing there with a gun. Both Nicholas and Franco, who was the manager of the Rivers Edge Restaurant, had known Britt, who worked in the same building, for about 3½ years, and they had seen him hundreds of times.

Nicholas got out of the car with his hands up and he, Franco and Scuris were told to get up against the loading dock and face the wall. When he first came around the car, Nicholas saw a man he later identified

as Caples up on the dock behind some garbage cans with a revolver. He had never seen Caples before but observed him that night for about a minute or a minute and a half. After he stood against the wall, he got hit on the head twice with a 5-minute interval between. After he was hit the second time, he fell, and his two friends were also hit; and they fell. Everything was then taken out of their pockets. After his pockets were emptied, he was hit over the head for a third time. When he got up he saw the two men running north out of the passageway onto Kinzie where their car was parked. He immediately ran up the stairs to Wells Street where DeFiore and the Kutises were waiting. He got in DeFiore's car and about three minutes later he saw the men in a 1967 black Dodge pulling out of the parking lot on Wells and Kinzie. DeFiore followed the black Dodge traveling east until they came to Fairbanks and Ohio. Nicholas saw a police car and got into it and continued following the black Dodge. He lost sight of it for a few seconds as it made a right turn onto the Outer Drive. After the black Dodge turned onto the Outer Drive, Nicholas saw it pull into an emergency parking area. When Nicholas saw the car, the doors were open, and he saw the defendants at the railing of the bridge in the position of throwing something toward the water. The officer he was with, Richard Crotty, pulled his gun and held the defendants until other police officers arrived. Nicholas was taken to a hospital where he received 12 stitches for the three gashes in the back of his head. He testified that the lights in the loading dock have 150-watt lightbulbs in them and burn all night long. The fluorescent lighting in the city parking lot is kept on 24 hours a day.

At the time Franco went to the car with Nicholas, he had a plain sealed envelope with the receipts of the day, which he had put in the pocket of his jacket. He could not recall the amount of those receipts. When a voice said, "Don't get in the car," he turned around and was facing a man he identified as Britt. There was a swinging door that was used to close the elevator. A voice from behind the door told him to face the dock, and Franco identified the man by the door as Charles Caples. After he faced the wall with his hands up, he was hit on the head with an object which he identified as a jack handle or tire iron. He was hit on the head again and told to lie down. He did not see the object with which he was hit directly, but he could see the shadow of a tire iron on the wall.

While he was on the ground, Caples came down and searched his pockets. Franco watched him put his hands in Franco's pocket and take out $475 and some papers that were in his wallet. Both men searched them twice, and about every 2 minutes they would walk down the alley to see if anyone was coming. He saw the two men going up a ramp leading upstairs.

Franco testified that as he looked north toward the parking lot there were no lights on. There were some tall buildings there, but it was not too dark. There were lights in the parking lot. There was no spotlight in the area where they were struck, but there were two lightbulbs on the top of the platform. The lightbulbs were about 11 feet apart and there was a rope on the end of the light. One could reach the rope and pull out the lights from the platform. When those lights were out the area was not dark. The fluorescent lights from the parking lot were still on.

Franco received 12 to 15 stitches in his head. He did not tell the police that the man that robbed him was Loring Britt because he planned to get Britt himself. He saw the face of each of the two men for about a minute.

John Scuris, who apparently had some language difficulties, identified Britt as the man he saw in the parking lot and Caples as the next person that he saw. He saw Caples on the left where the garbage cans were with a gun in his hand. After he and his friends walked to the wall the two men started hitting them. The men did not say anything to him, but he heard someone say, "Son of a bitch, he is alive," and they were pointing to Nicholas. Scuris was struck once and rendered unconscious. He testified that he saw what Nicholas was struck with, but he did not know what it was. Later he testified that when they started to hit Nicholas, he turned his head and saw a tire iron clearly. He had never seen the two men before.

Richard Crotty, a Chicago policeman, was driving a squadrol in the vicinity of Fairbanks and Ohio and saw Nicholas waving to him. After Nicholas got in the squadrol, Crotty proceeded eastbound on Ohio Street. After he made the turn onto Lake Shore Drive, he saw a dark Cadillac stop around an S-turn just before the bridge. He also saw a dark blue Dodge in the southwest corner of the U-shaped area. Crotty went past both cars, stopped and backed up and blocked off the exit to the U-shaped area so that no vehicles could get out. He got out of his squadrol and drew his revolver. The Dodge was in the U-shaped area, and the doors were open on both sides. The two defendants were inside the car seated in the front seat. Crotty testified that he saw a brown bag in the middle of the front seat. In the bag were a pair of rose-colored glasses, miscellaneous keys, a comb and checks. The checks were payroll checks and the payees were Peter Economopolis on one and John Scuris on three others. The checks were later identified by Scuris. Crotty searched the car and found a tire iron in the rear of the car on the passenger side between the seats on the floor. The checks that he found were altogether in the bag; some were loose and some were rolled up. He also found a wallet in the bag. When he first saw the defendants they were in

the car. From the time he stopped his car to the time he backed up, three or four seconds elapsed. As he was backing up he did not see either one of the defendants throwing anything over the bridge. He never saw them with guns at anytime.

Nicholas had told him that he knew one of the men when they were in the car going eastbound on Ohio Street. When he arrested the defendants he did not see any blood on their clothes nor did he see any blood when he searched the auto.

Officer Thomas P. Nyeran took the defendants to the lockup in his squadrol. When he searched them he did not find any weapons. Caples had $475 including three $100 bills. Britt had $274.

Edmon DeFiore testified that he and Terry and Steve Kutis went up to Wells where he had parked his car, got in and waited for the others. After waiting a while, he went around the block to see if they were coming out of the lower level. He heard some yelling, and Nicholas came running toward the car. His shirt, face and hands were full of blood. He jumped in DeFiore's car, and they went north on Wells Street. When DeFiore arrived at the first east-west street, north of Wacker Drive, a car pulled out of the lower level and he followed it. When he reached Ohio Street the car turned east. When they came to the intersection of Ohio and State, Nicholas jumped out of the car and hailed a police car. DeFiore continued following the car and never lost sight of it. He followed the car south onto Lake Shore Drive. At all times he was approximately 20 yards behind it. As he was following the car he saw only one man driving, but as the car turned south on Lake Shore Drive another man appeared in the front seat. The car pulled into the cul-de-sac on Lake Shore Drive, and the two men jumped out and walked over toward the railing. DeFiore slowed his car down, and he could see that one of the men was throwing something over the railing. He identified the defendants as the two men he saw at the railing. They were coming back to get in their car, but he could not remember if they actually got back in. Within a few seconds there were several police officers in the area. He saw one officer go into the car and pull out a brown bag. He saw a little black wallet, some identification of one of the fellows he had eaten with at the Rivers Edge Restaurant and some checks in the bag.

Caples testified that he was related by marriage to Loring Britt, whom he met in front of Britt's home at 5529 South Normal. They went to a party at 10 or 10:30 P.M. at 517 or 519 North Wells and left about 1 or 1:15 A.M. Caples had never been to that address before nor did he know anyone at the party. Britt knew some of the people at the party and had been at the location previous to August 23. After the party they went back to get in Britt's car which was in a parking lot about a half block

north of the Merchandise Mart. Caples was not sure whether the party was on the second or third floor. They left the parking lot and turned east on Kinzie. Britt testified that as they turned south on the Outer Drive at Ohio he noticed a police light behind him. He pulled over to the right lane to get out of the way. He saw a Cadillac car about 30 or 40 feet behind him and assumed that the police were pursuing it. The police car was just behind the Cadillac. The Cadillac proceeded on and the police pulled in front of the exit to the cul-de-sac after Britt had pulled the car into the emergency parking area. The police officer got out of the squad car, pulled his revolver and told Caples and Britt to get out of the car. Both denied robbing or striking any of the complainants. Both defendants testified that the police took items from inside the car which included Caples' wallet, sun-glasses and comb, all of which were in a brown paper bag in the car.

It was stipulated that a laboratory analysis of the tire iron disclosed no stains identifiable as blood; nor was any hair or human tissue found on the tire iron.

After the defendant filed a pre-trial discovery motion for a list of physical evidence, the State filed the following list:

"One tire iron painted black.
One black leather wallet with miscellaneous papers.
Three sets of keys.
One black hand rubber comb.
One pair of rose-colored glasses.
Ten photographs."

Scuris identified certain checks which were taken from him and were recovered by the police. The defendants moved to strike the testimony and the exhibits because the checks were not included in the list of physical evidence. That motion was denied by the trial court, and that ruling is assigned here as error.

■■ At the outset, we note that it is fairly arguable that there was no failure to disclose the existence of the checks since the State's answer included "miscellaneous papers." The defense apparently made no further effort to have these items particularized nor to inspect them despite an offer by the State to permit inspection. But more important, the indictment alleged that the defendants took "a number of checks from the person and presence of John Scuris." In addition, before trial, the defense requested and was furnished a copy of the crime detection laboratory report which listed cancelled checks issued to John Scuris and Peter Economopolis. Under these circumstances, the purpose of the discovery

rules—to prevent surprise and any unfair advantage—has been honored, and the defendant may not now complain.

Nicholas was asked if he had given a signed statement to the police and he said that he had. Franco said that he had made a statement to the police and signed it. During the cross-examination of each of these witnesses, the defense attorney asked for their signed statements; the State's Attorney said that they had none and that there were none in the police file. He offered to show his entire file to the defense attorney and the court. He contended that when the witnesses said that they signed statements, they were referring to the complaints. The defendants now contend that the trial court erred in not conducing an evidentiary hearing to determine whether or not written statements had in fact been given by the witnesses to the police. (See *People v. Camel,* 4 Ill.App.3d 106, 280 N.E.2d 294.) But we believe that the trial judge did conduct an evidentiary hearing and was justified in concluding that no written statements had been given by the witnesses to the police.

During the colloquy between the attorneys and the court in the course of Franco's cross-examination, it was disclosed that the detective in charge of the investigation was William Casey. The following occurred:

"State's Attorney: Judge, if you want to inspect our file, Judge, you are perfectly welcome. Here is our entire file. This is all the State's Attorney's Office has been given on this case. I will get Detective Casey in here. You can look through his own file. He will deny there was any verbatim statements [sic] taken from any of these witnesses.

\* \* \*

The Court: I want to get Casey in here.

\* \* \*

State's Attorney: We will tender to the Court the entire file.

The Court: This doesn't answer the question. I want to know from Casey.

State's Attorney: We will call him in.

State's Attorney: We will sit here until he comes in.

The Court: I want to know from Casey whether or not he took a verbatim statement from this man, typed it at a desk and handed it to him to sign. If the man says, all I did was type the complaint, that answers the question.

State's Attorney: Do you want to talk to him on the phone?

The Court: It is up to Mr. Washington. [Defense attorney.]

State's Attorney: Do you want to bring him in?

Defense Attorney: I think you should. This has come up twice.

Now I went over to make sure, to make sure there is no ambiguity.

&ast; &ast; &ast;

State's Attorney: Judge, let me further state for the record at this time that I have talked to Officer Casey myself. I have asked him whether or not there was any verbatim statement or any statement taken of these people that were signed by these people themselves, other than the court complaints. He told me no. The only statements he took he reduced to his report, which is supplementary.

The Court: Those reports you have?

State's Attorney: They have been tendered to Mr. Washington. He has inspected the same.

&ast; &ast; &ast;

State's Attorney: If the court requires we will have Officer Casey in here.

The Court: If they have to have him in here, just for the purpose of getting it on the record, so we don't have any problem.

State's Attorney: Sure, Judge."

Later, during the cross-examination of Franco the following occurred:

"Q. And you signed a complaint later, you said, charging the men with the robbery?

A. The same time, yes, within the same transaction. When he got through all asking me all the questions, when I got through he said, do you mind signing this, and I did.

Q. Did you sign the statement and then the complaint?

A. I don't know which one I signed first or second, both statements. I don't know if I signed twice, three, four, five times. I don't remember.

Q. But you do remember signing three—two separate things?

A. I remember signing two separate things, one or two. I don't remember if it was one or two.

Q. Did you give the police a statement and sign it or not?

A. I did sign it.

Q. All right. Then after that did you sign the complaint?

A. I must have signed the complaint. I must have signed something. I was signing papers there, yes.

Q. Do you know what you signed?

A. If you are asking if I read it, no, I didn't read it.

Q. Let me ask you this: Now, you said before that you signed the statement. Remember that—signed the statement for the police?

&ast; &ast; &ast;

The Witness: I said to you I signed. He asked me questions. I signed a piece of paper. I didn't read it. If that was a complaint I signed or insurance policy, I told you I didn't read it."

When Scuris was cross-examined the following occurred:

"Q. Did you sign any statement for the Police Officer?

A. I did. I signed something.

Q. Well, now, you signed something?

Y. Yes.

Q. But you don't know what you signed, do you?

A. He told me just, Police Officer told me he is police, just, he say, he told me to sign complaint. So I signed.

\* \* \*

Q. Did you sign anything; did you sign a statement as to what you told the police?

A. I don't remember what did I sign."

Officer Casey testified that he went to Henrotin Hospital during the early morning hours to investigate the robbery. Franco, Nicholas and Scuris were all being treated for head injuries. From there he went to the 18th District Station where Officer Crotty gave him the articles relating to the robbery investigation. Officer Catena gave him a wallet containing a Florida driver's license belonging to Franco. He interviewed all the parties concerned, then drew up the complaints and had Franco and Nicholas sign them. Five days later when Scuris regained consciousness he also signed the complaint. Casey testified as follows:

"Q. Did Mr. Nicholas ever give you a statement in connection with the robbery?

A. An oral statement.

Q. Did Mr. Franco ever give you a written statement in connection with the robbery?

A. Not a written statement.

Q. Did Mr. Scuris ever give you a written statement, a signed written statement in connection with the robbery?

A. A formal statement?

Q. Yes, one that he signed.

A. Not a formal statement in the sense of—

Q. Did you go to the hospital several days after the robbery to see Mr. Scuris?

A. No, sir, I didn't.

Q. When was the next time that you saw Mr. Scuris?

A. I believe it was at the first court appearance that he was available to attend or able to attend.

Q. Did Mr. Scuris ever sign a complaint?

A. Yes, sir, he did.

Q. And that was the complaint that you had prepared?

A. Yes, sir, it was.

Q. And did he sign that in court or in the police station?

A. He signed that in the hospital.

Q. He signed that in the hospital?

A. Yes, sir."

It was incumbent upon the defense to establish the existence of the possibly impeaching statement. (*People v. Dennis*, 47 Ill.2d 120, 129, 265 N.E.2d 385.) In our view, the trial court correctly concluded that the defense had failed to establish the existence of written statements.

■ ■ The tire iron recovered from the car was marked as an exhibit and shown to the witnesses, but its admission into evidence was denied. The defendants now contend that the identification and exhibition of the tire iron was totally without probative value and highly prejudicial. The State's Attorney, when asked by the trial court for his views on the admissibility of the exhibit, said:

"The State would just say it's offering it for the limited purpose of showing that the defendants did have a tire iron in a place in a motor vehicle not usually—that is not usually the place where a tire iron is kept. * * * The tire iron is usually kept in the trunk, Judge."

The State did not advance the argument in the trial court that it now advances here. If it had, we believe the trial court would have admitted the exhibit into evidence, and properly so. It has been consistently held that where there is evidence indicating that an accused possessed a weapon at the time of the offense, a similar weapon found in his possession at the time of his arrest may be admitted against him, even though not identified as the actual weapon used in committing the crime. (*People v. Tribbett*, 41 Ill.2d 267, 242 N.E.2d 249; *People v. Johnson*, 35 Ill.2d 516, 221 N.E.2d 497; *People v. Ostrand*, 35 Ill.2d 520, 221 N.E.2d 499; *People v. McCasle*, 35 Ill.2d 552, 221 N.E.2d 227; *People v. Dale*, 355 Ill. 330, 189 N.E. 269.) We judge, therefore, that the testimony identifying the tire iron was proper. We also note that in the discussion on the admissibility of the exhibit the court said: "There had been testimony of finding a tire iron, and that testimony is in the record and before the jury." The defense attorney then said: "They can consider it for what it's worth." In his closing argument, the defense attorney referred to the tire iron found in the automobile and said that the crime laboratory tests had shown that it could not have been used in the robbery. The defense took the position that it was all right for the jury to consider testimony concerning the tire iron being found in the car but it could not consider

the tire iron itself. In our view that position is inconsistent. See *People v. Dowling*, 51 Ill.2d 370, 282 N.E.2d 696.

The trial court would not permit the defense to show that before trial Caples, his attorney and a photographer went at 1 A.M. to the area where the robbery had taken place. The photographer sought to take pictures on concededly private property and was prevented from doing so by Franco and Nicholas and others, including a Chicago police officer. The defense also made an offer of proof that the police officer and Franco drew guns. The defendants contend that the proof was relevant "because it would have permitted the jury to draw an unfavorable inference against the prosecution. The customary rule is an adverse inference may be drawn against one who conceals evidence."

■■ The witnesses were not required to permit an unheralded and uninvited defendant on their property in the early morning to take pictures any more than they were required to submit to an interview by defense counsel. (See *People v. Peter*, 55 Ill.2d 443, 451, 303 N.E.2d 398.) Supreme Court Rule 412(h) provides as follows: "Upon a showing of materiality to the preparation of the defense, and if the request is reasonable, the court in its discretion may require disclosure to defense counsel of relevant material and information not covered by this rule." (Ill. Rev. Stat. 1971, ch. 110A, sec. 412(h).) We believe that under this rule, if not the inherent power of the court, the defense attorney could have sought an order upon the State and its witnesses to permit the taking of the pictures at the time the defense deemed appropriate. Under all these circumstances, therefore, we conclude that the trial court's ruling was not error.

John Scuris testified that there was a hole in his head on the left side. He was then permitted over objection to display his head to the jury. The defendants now contend that the only purpose of the display was to prejudice them in the eyes of the jury and that the court's ruling constituted reversible error. We believe *People v. Swaney*, 2 Ill.App.3d 857, 859, 276 N.E.2d 346, is clearly in point. In that case the defendant was charged, as here, with aggravated battery. The complaining witness testified to the severity of his wounds, blood all over himself, his intestines hanging out and pain experienced. He exhibited his scars to the jury. The court held that, since the nature or seriousness of the injury inflicted was at issue, no error was committed. Similarly, in this case the nature and extent of the complainant's injuries were in issue. Consequently, it was not error for the trial court to allow Scuris to exhibit his head wound to the jury.

The defendants also contend that the court committed error in restricting their cross-examination of Officer Crotty. He had testified on direct

examination that after he ordered the defendants out of the car he saw a brown bag in the middle of the front seat and recalled that the contents of the bag included payroll checks of John Scuris. Neither in his police report nor his Grand Jury testimony did he say that he found the checks inside Britt's automobile. Before the Grand Jury he testified as follows:

"Q. Was any of the property belonging to Mr. Scuris, namely some checks, ever recovered from the area of where the defendants were arrested?

A. There is like a bridge there. I found it on the bottom. Well, there is an overpass. I found it on the bottom there. There was about—500 Lake Shore Drive there, right near the scene there."

The defense attorney was prevented from asking Crotty whether he ever told the grand jury that he found any checks in the bag in Britt's automobile. The defense offered to prove that Crotty would answer in the negative. The defense should have been permitted to ask the question and to show that he had never told the grand jury that he had found the checks in the automobile (*People v. Bonham*, 348 Ill. 575, 591, 181 N.E. 422); but in our view the ruling in no way prejudiced the defendants. In light of the positive identification by three witnesses, two of whom knew the defendant Britt and one of whom had the exact amount of money taken that was recovered from Caples and the arrest within minutes of the offense, whether the checks were found in the car or in the nearby vicinity seems of little moment. Crotty's testimony in no way affected the testimony of the identifying witnesses. And in his closing argument the defense attorney in attacking the credibility of Crotty said:

"Some of it was made somewhat easy by Mr. Crotty, because when he was asked specific things, specifically in the Grand Jury, where did you find those checks, the Grand Jury testimony that these men stipulate is accurate, he never told the Grand Jury that he found any checks in a bag sitting besides Mr. Charles Caples. He went back to the original plan of the wallet under the bridge and later, since you don't have it in any reports, since you don't have it when you testified under oath, later he decided to get up here and tell you for the first time it was in a bag. That is a lie. That is a lie. He didn't tell the Grand Jury it was in a bag because it wasn't in a bag and he tried to fumble an excuse like, I misunderstood. How could you possibly misunderstand somebody that says, where did you find those checks, namely the checks of John Scuris? I don't think any of you can possibly forget that question and those answers, and he never started saying in a bag sitting next to Charles Caples, with sunglasses and his comb. What did

he do with the checks? According to him. Why can't we find some inventory? He mumbled some excuse, I inventoried them as miscellaneous papers.

The most important evidence in this case, the most significant piece of evidence in this case, piece of evidence that they wanted to forfeit the freedom of these two men on, and no mention in the detective's report, no mention of it in his own report, no mention of it before the Grand Jury and inventoried under some miscellaneous papers somewhere—let's go farther, because I think somewhere along the line some outsider interjected himself."

It thus appears that the point the defense wish to make—that Crotty had not told the grand jury he found the checks in the car—was made before the jury.

During the closing argument the assistant State's Attorneys read from a transcript purportedly of the opening statement of the defense attorney and repeatedly told the jury that the defense attorney had failed to prove certain things he had told them the evidence would show. In particular, the prosecutor told the jury: "Counsel told you that he will submit to you that the evidence will show no money was found on their person or automobile. Yet you know $700 was found on their person." What the defense attorney actually said in his opening statement was: "We submit the evidence will show at the time of their arrest Mr. Britt and Mr. Caples between them had in their pockets $700 or a little more." He later said: "We also submit to you that the evidence will show that no money, no checks were found on their persons or in their automobile." It would thus appear that the statement by the prosecutor in his final argument was inaccurate. But accurate or not, as a general rule, statements by a prosecutor that the defendant has failed to prove things his attorney said the evidence would show are to be condemned. We have found no case directly on the point in Illinois. In *People v. Durso*, 40 Ill. 2d 242, 239 N.E.2d 842, the defense attorney in his opening statement said that they would show that money left at a tavern was a loan in connection with a barber shop contrary to the testimony of a witness that it represented proceeds from a sale of narcotics. In his argument the prosecutor asked where that evidence was and did they prove it. The defendant contended that the argument was prejudicial in that it made it appear that the defendants were being tried on an issue of narcotics rather than murder and further that the prosecutor impliedly commented on the defendant's failure to testify. The supreme court held that there was no error, but we emphasize that the opinion was addressed to the specific points raised by the defense.

We believe the Supreme Court of California's holding in *People v.*

*Pantages*, 212 Cal. 237, 244-45, 297 P. 890, 894, is persuasive. The court held:

> " 'It is clear that in the trial of an action, proper argument should be based solely on the evidence and that if the opening statement to the jury does not constitute evidence and is not binding upon the party making it, then, in the absence of "bad faith" his failure to "make good" should not be argued by the opposite party as a reason for a verdict. The conviction of a defendant of the crime of which he is accused should rest not even slightly upon the dereliction (if any) of his counsel, but ordinarily should be grounded upon acts committed by the defendant either actually or by law imputed to him. * * *.' "

■■ This case illustrates the wisdom of the holding in *Pantages*. Crotty's testimony before the grand jury would lead one to believe that he would testify at the trial that he found the checks other than in the car. The defense had the right to rely on the grand jury testimony and it should not be penalized by the fact that the witness apparently changed his testimony. But we note that the defendants made their first and only objection to this line of the State's argument when the prosecutor said: "Defense counsel told you in his opening statement that these men were robbed and beaten and their money was taken." No ruling was made on that objection. Immediately thereafter an objection was made to the argument that the defendants did not explain where they got the money that was found on them. That objection was sustained. No objection was made later to the assertion that the defense counsel had said in his opening statement that the evidence would show no money was found on their person or their automobile. We, therefore, judge that the defendants' argument on this point has been waived. Moreover, in view of the strength of the State's evidence, which the defendants do not question here, any error in this argument we deem harmless.

■■ Last, the defendants contend that the sentence is excessive in view of their background and character. Britt was a high school graduate who had completed one year of college. He was married with three children and owned his own home. He had been continuously employed since 1964. His wife was a school teacher, and he belonged to several civic organizations on the south side. He had never been arrested before. Charles Caples was 29 years old and had been honorably discharged from the service. He was married with three children. He graduated from high school and earned two years of college credits. His only criminal record was an arrest in which he was discharged. The record shows that the court in sentencing said that the men would be entitled to probation under ordinary circumstances for a crime of less violence

than the one for which they have been convicted. In view of the vicious and cold blooded nature of the assaults on the three complainants, we see no reason to substitute our judgment for that of the trial court's. The judgments of the circuit court are affirmed.

Judgments affirmed.

BURKE and GOLDBERG, JJ., concur.