THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DAVID BEVERLY, Defendant-Appellant.

First District (1st Division)    No. 76-1530

Opinion filed July 31, 1978.—Rehearing denied September 6, 1978.

James J. Doherty, Public Defender, of Chicago (Marc Fogelberg, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Mary Ellen Dienes, and J. Jonathan Regunberg, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant David Beverly was charged by indictment with the murder of William Templin and with the attempt murder and aggravated battery of police officer Daniel Hammond. Defendant was tried by a jury in the circuit court of Cook County, which returned verdicts of not guilty of murder, guilty of attempt murder and guilty of aggravated battery. The court entered judgment only on the finding of guilt on the charge of attempt murder and sentenced defendant to imprisonment for from 10 to 30 years.

Defendant appeals, contending that (1) the jury was improperly

instructed on the mental state required for a finding of guilt of attempt murder, (2) he was not proved guilty beyond a reasonable doubt, (3) his post-arrest statement should have been suppressed because it was not shown that he knowingly waived his rights prior to making the statement, (4) a photograph was improperly admitted into evidence without foundation, (5) two inflammatory handbills were improperly admitted into evidence because they were irrelevant to the crime charged, (6) certain cross-examination of defendant and closing argument remarks by the prosecutor denied defendant a fair trial, and (7) his sentence is excessive.

We reverse because the jury was improperly instructed. Because the defendant argues the evidence was insufficient to prove him guilty beyond a reasonable doubt and because certain evidentiary questions may recur on retrial, it is necessary to present a statement of facts.

On May 19, 1974, at about 10 p.m., the body of William Templin was found in the Penn Central Railroad yard near St. Lawrence Avenue and the Chicago Skyway, in the city of Chicago, by Penn Central security guard Joseph Gill. Templin, who was being trained as a probationary guard by Gill that evening, was not armed. The body was found lying face-down with hands behind the head. The victim had been shot in the back of the neck. Gill saw two heads appear above the crest of an embankment and yelled "halt," but was fired upon. He returned the gunfire until he emptied his gun, then ran to his car and called the police. It was dark in the train yard and he could not tell whether the persons he had seen were black or white.

Officer Ally of the Chicago Police Department went to the railroad property and searched the area near the body. He found two army-type duffel bags and a suitcase in a clump of bushes. Contained in these bags were an American flag, items of clothing, three gas masks, three rifle cleaning kits, 1425 live rounds of .38-caliber ammunition, a loaded .38 revolver in a holster, sunglasses, newspapers, a quantity of mimeographed papers and a quantity of mimeographed cards bearing a declaration of war and threats of death against Chicago policemen, and two wallets containing identification papers of Lonell Mosley and the defendant David Beverly. Another policeman recovered a spent .30 bullet from beneath Templin's body and six spent .30 cartridge casings were recovered near the embankment.

Minutes after Gill was shot at, Dorothy Wren and Pamela Word were in a car stopped at 70th Street and Prairie Avenue, a short distance from the Penn Central yard, when they were approached by a black man in black military-style clothing, carrying a rifle. The man said, "It's revolution day. You had better get out. I want your car." The women got out of the car. Jesse Word, an off-duty Chicago policeman and the father of Pamela

Word, who was parked across the street, went over to investigate. The man with the gun shot, hitting Officer Word in the side. Shots were exchanged and the man with the gun, later identified as Victor Alto, was killed. Officer Thomas Ginnelly recovered the .30-caliber carbine carried by Alto, along with numerous live cartridges and loaded cartridge magazines fitting the weapon. Also recovered was a rucksack carried by Alto, containing a manual for the weapon and a quantity of the mimeographed papers similar to the ones recovered at the scene of the Templin killing.

Officer Daniel Hammond of the Chicago Police Department was in plainclothes and in an unmarked police vehicle that evening between the hours of 10:15 and 10:30 p.m., when he heard shots. He proceeded from his location at 69th Street and Calumet Avenue east to Anthony and turned right on Anthony. Near 70th Street he observed three male Negroes wearing dark clothing enter a gangway between two apartment buildings. One of the men had what appeared to be a rifle in his hands. Hammond exited his car, drew his service revolver and pursued the figures. He saw a figure on a stairwell of the building as he approached, heard a shot and was hit in the right arm, losing his gun. He managed to escape the gangway, while other shots were fired at him. When he saw the three male Negroes he could not distinguish any facial characteristics.

Officer Maurice Ford was in a patrol car and responded to a radio call, driving to 70th Street and Eberhart Avenue. He heard shots as he approached. He parked the car across the gangway between the building on the corner and the adjacent building on Eberhart, exited his car and drew his gun. He aimed a spotlight down the gangway and in the illumination of the light he observed a male Negro, 20 to 23 years old, with an Afro natural hairstyle and wearing a white pullover T-shirt and dark pants, running down a stairway on the outside of a building. Ford twice ordered the person to halt, but the person jumped to the ground from the landing between the first and second floors and ran westbound between the buildings toward Eberhart. Ford chased the man, losing sight of him for a few seconds, but seeing him again as he ran onto Eberhart and hid behind a van parked on the street. Ford went to the van, saw that the man hiding was the same man he had seen on the stairwell and, after a struggle, arrested the person. This man was the defendant, David Beverly.

Ford and his partner picked up the wounded Officer Hammond and helped him into the back of the patrol car, where the handcuffed defendant had been placed, and drove to Billings Hospital. Ford took the defendant into the police room at the hospital and advised him of his rights. Ford asked the defendant three times if he understood his rights, but the defendant made no response. Ford then transported defendant to

the police station at 91st Street and Cottage Grove Avenue, arriving at 12:10 a.m. As he was handcuffing defendant to the wall in a room at the station, Ford asked the defendant if he had any regrets. Defendant stated, "Yes, that I didn't off the two Uncle Tom motherfuckers that caught me." But Ford never recorded this statement in any police report. Ford further testified that he never saw defendant in possession of a weapon that night.

Officer Donald Mitchell arrived at 70th Street and Eberhart at about 11 p.m. and entered the gangway between the building on the northeast corner of that intersection and the building directly north of it. He saw a man crouched on a stairwell with a rifle in his right hand. Mitchell ordered the man to halt, and the man dropped the gun, and after a struggle with the police present was arrested. This man, later identified as Lonell Mosley, was wearing a black military field jacket, a black turtleneck sweater and black fatigue pants bloused in his boots. Recovered from the stairwell where Mosely had been crouching were a .30 carbine rifle, a handgun later established to be Officer Hammond's service revolver, and a canvas military-type bag which contained over 100 .30 cartridges and several loaded 30 round magazines to fit the rifle. Expended cartridge casings were recovered from the yard and a number of spent .30 bullets were dug out of a wooden garage to the rear of the apartment building.

Officer John Burge, some time after 5 a.m. following the arrests, searched the area behind the buildings north of the northeast corner of 70th and Eberhart. Behind the third building north of the intersection, on a stairwell, he found a .30 carbine rifle, an army rucksack containing rubber gloves, five 30 round .30 magazines and one 50 round .30 magazine, all fully loaded, numerous live cartridges and two black knit pull-on hats, a black army fatigue jacket and a black knit turtleneck sweater. The clothing bore no identifying characteristics.

Robert Ruvel, a retail gun merchant, identified defendant as the David Beverly who purchased two .30 carbine rifles from him on March 19, 1974, and who took possession of the rifles on March 21, 1974. From his business records and the serial numbers on the guns, Ruvel identified the rifle recovered from Mosley and the rifle found in the stairwell behind the third building north of 70th and Eberhart as the guns he had sold to defendant.

Officer Donald Smith, qualified as an expert firearms examiner, examined the weapons and expended bullets recovered. He gave his opinion that the bullet recovered from the scene at 70th and Prairie could only have been fired by the gun in Victor Alto's possession at the time he was killed. He also concluded that the bullets recovered from the garage behind the apartment buildings had been fired by Alto's gun. Finally, Smith concluded that the bullet found underneath the through-and-through wound which killed William Templin could only have been fired

by the .30 carbine found by Officer Burge in the stairwell behind the third building north of 70th and Eberhart.

The defendant testified that he was 23 years old at the time of trial in October 1975. May 19, 1974, was Malcolm X's birthday and African Liberation Day and he participated in a parade to celebrate these events which originated at 35th Street and King Drive. He arrived at that location at about noon and met Lonell Mosley and Victor Alto. Defendant was wearing black and green army boots, black army fatigues, a white pullover sweater and a light brown corduroy coat. Many people there were wearing African or military clothing and Mosley and Alto were dressed in black military-style garb. The defendant testified that he had planned a trip to Columbia, Mississippi, with Mosley and Alto to visit Mosley's fiancee and, upon meeting them at the parade site, he told Mosley and Alto to be sure to come to his house that evening by 9 o'clock with their bags packed for the trip. Defendant separated from Mosley and Alto and participated in the parade and the following picnic, then returned home to 328 East 70th Street at about 8 p.m. At about 9 p.m. Mosley arrived with a suitcase and Alto arrived shortly thereafter with a green duffel bag.

The defendant testified that he had purchased four .30 carbine rifles and two .38 handguns and had kept them in a closet at home, along with three gas masks that had been purchased by Alto in April, about 2000 rounds of ammunition and three gun cleaning kits. Defendant said he was concerned that his younger brother and sister, who lived in the same apartment with defendant and defendant's mother, would be alone with the guns. Alto said that the guns could be stored at his house. Defendant then took all the clothes out of the bag he had packed and put into the bag the guns, bullets, cleaning kits and gas masks and three rucksacks. Alto made a telephone call and said he had transportation coming. Defendant gave Alto his wallet containing his identification papers, which included an Illinois firearms owner identification card, in case Alto was stopped on the way to his house and needed to explain his possession of the guns. Defendant and Mosley accompanied Alto out of the house with the bags and then returned upstairs, leaving Alto outside.

Defendant testified he never saw Alto again. He and Mosley waited upstairs until 10:10 for Alto to return from the six-block walk to his home. Mosley and Alto had been wearing the same black outfits they had worn to the parade, and defendant was wearing the white pullover sweater he had been wearing, but he did not have his jacket on. Defendant and Mosley left defendant's house to look for Alto, walking east on 70th Street. As they reached Eberhart they heard gunshots, then saw four figures, all wearing dark clothing and carrying what appeared to be guns, running toward them down the middle of 70th Street. Defendant told

Mosley that the four men looked like they were in trouble and that they should get out of their way. Defendant and Mosley then turned around and entered an alley north of 70th Street, then entered the first yard. Mosley went in first and in the darkness defendant lost sight of him and did not see him again that night. Defendant stooped down behind some garbage cans in the rear of the building and heard running footsteps, followed by gunshots. Then he got up and "trotted" through the yard westward, jumped over a fence into the backyard of the 506-508 East 70th Street building, then ran through the gangway between the building on 70th and Eberhart and the building directly to the north. Defendant testified that he never went into any other yard, nor did he have a gun while he was in the backyards. He did not see anyone on Eberhart or hear any more shots, so he walked out of the gangway westward to Eberhart and, as he stepped over the curb near a van, he heard two voices yell, "Halt." He stopped and two uniformed policemen approached him, arrested him and told him to shut up. He was transported in a police car with a wounded policeman to Billings Hospital, where Officer Ford asked him his name, address, telephone number and place of employment, and defendant answered. He was then taken to the police station, where Officer Duncan asked him if he had any knowledge of a young man aged between 19-21, with a big natural hairstyle and wearing a black army fatigue jacket and pants and black and green boots, and the defendant responded that it was Victor Alto. Defendant had never been convicted of a felony.

On cross-examination, defendant testified that he had known Alto for three years and Mosley for 2½ years. Though the three men had for some time planned to go to Mississippi on May 20 by bus, they had not purchased any tickets yet nor had they consulted a bus schedule nor called the bus depot to learn whether a bus would be leaving on the 20th. Defendant had kept the guns and ammunition in the closet at his home since they were purchased, beginning in the preceding December when he purchased the handguns. Defendant denied that he had ever owned or worn a black fatigue jacket to match the pants he was wearing that night. Defendant did not speak to the four armed men he saw running on 70th Street, nor did he know if Alto was one of them. While he was in the alley he did not see any policemen or police cars. When he took his clothes out of his own bag to pack the weapons, he placed the clothes in Alto's bag, but he did not see the contents of Alto's bag. Defendant stated that he had never seen the hate literature found in the bags at the railroad yard before his arrest, but admitted that envelopes containing copies of the mimeographed sheets found in the bags had been addressed in his handwriting. Defendant further admitted that the identification papers for "David Beverly" and the sunglasses, all found in the bags at the

railroad yard, were his own. Defendant denied that he had ever seen the black jacket, black turtleneck shirt and black knit cap found in the stairwell near 70th Street and Eberhart. (He tried on these items of clothing before the jury at the State's request.) Defendant was shown a photograph, Exhibit 25(c), which showed a young black man seated in a chair wearing sunglasses, a black jacket, black turtleneck sweater and black knit cap. Defendant admitted that some of the writing on the back of the photograph was his own, but stated that the person depicted in the photograph was his brother Bruce Beverly. Defendant stated that his brother Bruce sometimes wears defendant's prescription sunglasses, but that he didn't recognize those worn in the photograph as his own sunglasses.

After arguments and instructions, the jury deliberated and returned a verdict of not guilty of murder of Templin, but guilty of attempt murder and guilty of aggravated battery as to Officer Hammond.

The defendant was tried on the charge of murder of the security guard William Templin and the attempt murder and aggravated battery of police officer Daniel Hammond. At the close of the evidence, the jury was instructed in pertinent part and in the following order:

"A person, or one for whose conduct he is responsible, commits the crime of attempt who, with intent to commit the crime of murder, does any act which constitutes a substantial step toward the commission of the crime of murder.

The crime attempted need not have been committed." IPI Criminal No. 6.05, as modified.

"To sustain the charge of attempt murder of Daniel Hammond, the State must prove the following propositions:

First: That the defendant, or one for whose conduct he is responsible, performed an act which constituted a substantial step toward the commission of the crime of murder; and

Second: That the defendant, or one for whose conduct he is responsible, did so with intent to commit the crime of murder. * * *" IPI Criminal No. 6.07, as modified.

"A person, or one for whose conduct he is responsible, commits the crime of murder who kills an individual if, in performing the acts which cause the death,

he, or one for whose conduct he is responsible, intends to kill or do great bodily harm to that individual; or

he, or one for whose conduct he is responsible, knows that such acts will cause death to that individual; or

he, or one for whose conduct he is responsible, knows that such acts create a strong probability of death or great bodily harm to that individual." IPI Criminal No. 7.01, as modified.

"To sustain the charge of murder, the State must prove the following propositions:

First: That the defendant [or one for whose conduct he is responsible] performed the acts which caused the death of William Templin;

Second: That when the defendant [or one for whose conduct he is responsible] did so,

he [or one for whose conduct he is responsible] intended to kill or do great bodily harm to William Templin, or

he [or one for whose conduct he is responsible] knew that his act would cause death or great bodily harm to William Templin, or

he [or one for whose conduct he is responsible] knew that his acts created a strong probability of death or great bodily harm to William Templin. * * *" IPI Criminal No. 7.02, as modified.

Defendant argues that these instructions permitted the jury to find him guilty of attempt murder without a finding of specific intent to kill.

We recently reversed a conviction for attempt murder in a case in which the full murder definition instruction, except for the felony-murder definition of IPI Criminal No. 7.01, was given. (*People v. Washington* (1978), 60 Ill. App. 3d 662, 377 N.E.2d 397.) We followed the supreme court's opinion voiced in *People v. Harris* (1978), 72 Ill. 2d 16, 27, 377 N.E.2d 28, 33, that "[a]n instruction must make it clear that to convict for attempted murder nothing less than a criminal intent to kill must be shown." But neither the defendant in *Harris* nor the defendant Shields in the consolidated case, nor the defendant in *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888, was tried at the same time for attempt murder of one person and the murder of another person.

Here, the jury was correctly instructed on the offense of murder of William Templin because murder is committed not only when a person intends to kill another individual, but also when he intends to do great bodily harm, or when he knows that his acts create a strong probability of death or great bodily harm. (Ill. Rev. Stat. 1973, ch. 38, par. 9—1(a); *People v. Harris* (1978), 72 Ill. 2d 16, 23, 377 N.E.2d 28, 31.) The jury was not given a separate instruction defining murder for the purpose of the attempt murder charge. The instructions given on attempt murder (IPI Criminal Nos. 6.05 and 6.07) both required a finding of the mental state of intent to commit the crime of murder.

■■ Though we have strong reservations due to the facts of this case and the circumstance that defendant was also tried for murder, we are compelled to conclude that *Harris* requires reversal here. Though the mental state required by the instructions given on attempt murder was "intent," which is correct under *Harris*, by instructing that the mental state required to be proved was "intent to commit the crime of murder," and

then defining murder according to IPI Criminal No. 7.01, the jury could have found defendant guilty of attempt murder without specifically finding that defendant, or one for whose conduct he was responsible, acted with intent to kill Officer Hammond, as required by *Harris*. On retrial, the jury must be instructed that a finding of intent to kill is necessary to convict on a charge of attempt murder. *Harris; Washington*.

■■ Defendant argues that his conviction should be reversed outright because he was not proved guilty beyond a reasonable doubt. Having reviewed the evidence, we disagree. The evidence was largely circumstantial, but circumstantial evidence is sufficient to support a conviction. (*People v. Heflin* (1978), 71 Ill. 2d 525, 376 N.E.2d 1367.) In addition, there was direct evidence that defendant fled from the gangway after being ordered to halt by the police. And Officer Hammond testified to the circumstances surrounding his being wounded. In addition, defendant's testimony was inconsistent with other unrebutted evidence introduced at trial. For instance, defendant said that Mosley was unarmed when they went looking for Alto, yet Mosley was arrested in possession of one of defendant's rifles. Defendant also did not account for Mosley's identification being found with his own at the scene of the Templin killing. Defendant's testimony was not required to be believed by the jury. (*People v. Graham* (1975), 27 Ill. App. 3d 408, 327 N.E.2d 261.) We are satisfied that the evidence properly admitted was sufficient to prove defendant guilty of attempt murder. Defendant is therefore entitled to a new trial, but not an outright reversal.

■■ The photograph identified as People's Exhibit 25(c) should not have been admitted into evidence. A hearing was held on a defense motion to suppress the photograph and the court determined that the photograph had not been seized as part of an illegal search, as the defense contended, but was in fact found in one of the bags containing guns, ammunition, gas masks and mimeographed statements in the train yard. The defendant admitted that some of the writing on the back of the photograph was his own. Since the court found as a matter of fact, which we are not called upon to upset, that the photograph was properly obtained and that a foundation through a stipulation as to chain of custody existed, the photograph was properly admissible as showing some connection between the defendant and the scene of the Templin murder. However, the prosecutor sought to use the photograph to show that the defendant once wore a black hat, black turtleneck shirt and black military jacket, a fact which the defendant denied. On cross-examination of the defendant, he was asked by the prosecutor who was depicted in the photograph and the defendant stated it showed his brother, Bruce Beverly. No other witness testified as to who was depicted in the photograph. The State

argues that defendant's sister testified during the hearing on the motion to suppress that in fact the defendant was the person pictured in Exhibit 25(c). We have reviewed the record of that hearing and find no evidentiary support for this argument. ⸱ Having attempted an impeachment by means of this photograph, the prosecutor never sought to complete it by presenting any other evidence that the person depicted in the photograph was the defendant. The prosecutor went on to argue to the jury that the photograph showed the defendant wearing the clothes he denied ever wearing.

■■■⸱ A photograph of an individual is competent to show a particular fact where the accuracy of the photograph is first proved by the testimony of a person acquainted with the appearance of the individual at the time the photograph was taken. (*People v. Donaldson* (1962), 24 Ill. 2d 315, 181 N.E.2d 131.) No one here testified that the person depicted was the defendant; it was error to admit it to show defendant wore the black clothes. (*People v. Thomas* (1967), 88 Ill. App. 2d 71, 232 N.E.2d 259; see Flood and Stevenson, *Photography in Illinois Litigation*, 66 Ill. Bar J. 528 (1978).) The error was compounded by the prosecutor's failure to complete the impeachment and argument to the jury. *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353.

■■ The mimeographed papers and cards bearing threats of racial war and death to law enforcement officers were properly admitted into evidence. They were part of the inventory of physical evidence found at the crime scene and the chain of custody was established by stipulation. Defendant admitted that envelopes containing identical statements, which were found in one of the bags, had been addressed in his handwriting. Defendant argues that these statements were highly inflammatory and prejudicial, and irrelevant to prove his guilt of the crimes charged. However, we find that the statements meet the tests of *People v. Scott* (1918), 284 Ill. 465, 120 N.E. 553, in that the threats made were of such a character as to indicate a hostile purpose on the part of the author and the language used was broad enough to include the victims Templin and Hammond within the class of persons threatened. The fact that defendant denied authorship of the statements or knowledge of what was in the envelopes he addressed was presented to the jury, which was free to believe or disbelieve his testimony. But the physical evidence itself was properly admitted.

■■ During cross-examination of defendant and closing arguments, the prosecutor made reference to defense counsel's opening statements about what he believed the evidence would show. This matter is not likely to be repeated on retrial, but we repeat our admonition in *People v. Britt* (1974), 22 Ill. App. 3d 695, 707, 318 N.E.2d 138, 148, that "* * * as a general rule, statements by a prosecutor that the defendant has failed to

prove things his attorney said the evidence would show are to be condemned."

Finally, defendant argues that the statement he allegedly made to Officer Ford should have been suppressed. A pretrial hearing was held on defendant's motion to suppress. Officer Ford testified that he arrested the defendant, as set forth above, and transported him to Billings Hospital, where, in the police room, he read defendant his rights from a card and asked defendant if he understood his rights. According to Ford, the defendant remained silent. Ford asked again if defendant understood his rights, and the defendant "just rolled his eyes looking at [Ford]." Ford asked a third time if defendant understood, but the defendant remained silently staring at Ford. Ford then transported defendant to the police station. At the station, as Ford was handcuffing defendant to the wall, and without any further warnings being given, Ford asked the defendant if he had any regrets. Ford testified that defendant stated, "Yes, that I didn't off the two Uncle Tom motherfuckers that caught me." However, Ford admitted that he told no one of the statement and did not include it in any police report.

Ford then relinquished custody of defendant to Officer Melvin Duncan, who testified that defendant told him Ford had already advised him of his rights. Duncan again advised defendant of his rights and asked if defendant understood them. Defendant responded that he did. Duncan then described the physical appearance and clothing of a person who had been shot and killed at 75th and Prairie, and defendant, according to Duncan, identified the person as Victor Alto and stated, "Is the brother really dead?" Defendant then refused to speak any more and the questioning ceased.

Defendant testified at the hearing that after his arrest he was beaten and threatened by several policemen, including Officer Ford. Defendant denied that Ford had ever advised him of his rights and denied that he made any statement to Ford. Defendant admitted that he identified Alto to Duncan based on Duncan's description of the dead man. In rebuttal, the State produced witnesses who testified that defendant had not been beaten or abused and bore no wounds or bruises on his body and did not ask for medical attention after his arrest.

The court denied the motion to suppress, finding that defendant had been twice advised of his rights, that he waived his rights and that the statements were not coerced.

■■ Defendant's theories at trial, therefore, were that (1) he did not make the statement, and (2) if he did, it was because he had been beaten and threatened, and (3) in any event, the statement was made during custodial interrogation before *Miranda* warnings had been given to him. Having heard the evidence and observed the witnesses, the trial court

found these factual questions against the defendant. We do not find them to be against the manifest weight of the evidence and they are accepted here. *People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771.

Now on appeal, defendant argues a fourth theory, that there was no showing that he understood his rights before he made the statement to Ford. It is argued that because he stood silent when asked three times by Ford if he understood his rights, the record is devoid of any evidence that defendant did understand them before the statement was made.

A knowing waiver may not be presumed from silence or from the fact that a confession was eventually obtained. (*Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602.) We applied this rule in *People v. Willis* (1975), 26 Ill. App. 3d 518, 325 N.E.2d 715, and in *People v. Landgham* (1970), 122 Ill. App. 2d 9, 257 N.E.2d 484, *cert. denied* (1971), 402 U.S. 911, 28 L. Ed. 2d 652, 91 S. Ct. 1389, by holding that where the record is devoid of any evidence that defendant waived his rights prior to making the statement, the State has failed in its burden of showing an intentional relinquishment of a known right or privilege, and the statement must be suppressed. The State cites *People v. Higgins* (1972), 50 Ill. 2d 221, 227, 278 N.E.2d 68, 72, *cert. denied* (1972), 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195, for the principle that "[o]nce the defendant has been informed of his rights and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows of his rights and chooses not to exercise them." But here, the defendant never indicated that he understood his rights before making the statement.

■■ To determine whether the defendant understood his rights, in the absence of his declaration that he did, the surrounding circumstances may be examined. (*Higgins; Landgham.*) Here, the defendant never testified that he did not understand his rights; his contention at trial was that he was never informed of his rights. At the time of his arrest, defendant was an adult and had completed high school and one year of college-level studies. In the absence of evidence of diminished mental capacity due to intoxication, as in *Willis,* this raises a fair inference that defendant understood the English language as employed in the *Miranda* warnings. From the transcript of the proceedings at which defendant testified, it is clear that defendant was of at least average intelligence and able to grasp the meanings of questions asked of him quite well. And Officer Duncan testified that when he first saw defendant, the defendant told him that Officer Ford had already advised him of his rights. All of these facts and circumstances, taken together, lead us to conclude that defendant understood his rights before he made the statement to Ford, and the statement was therefore properly admitted.

Defendant also argues that his sentence is excessive. We need not discuss this issue because defendant must be given a new trial.

The judgment is reversed and the cause is remanded for a new trial consistent with the views expressed herein.

Reversed and remanded.

GOLDBERG, P. J., and McGLOON, J., concur.